[989 NYS2d 238]

MACY'S, INC., et al., Plaintiffs, v J.C. PENNEY CORPORATION, INC., Defendant.

MACY'S, INC., et al., Plaintiffs, v MARTHA STEWART LIVING OMNI-MEDIA, INC., Defendant.

Supreme Court, New York County, June 16, 2014

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

### APPEARANCES OF COUNSEL

*Jones Day*, Cleveland, Ohio (*Theodore M. Grossman* of counsel), for plaintiffs.

*Munger Tolles & Oslon LLP*, Los Angeles, California (*Mark H. Epstein* of counsel), for J.C. Penney Corporation, Inc., defendant.

*Friedman Kaplan Seiler & Adelman LLP*, New York City (*Eric Seiler* of counsel), for Martha Stewart Living Omnimedia, Inc., defendant.

### OPINION OF THE COURT

JEFFREY K. OING, J.

## The Stakes

These consolidated actions involve three of this country's largest retailers, one with a marquee name recognized as a retail giant, one that is a household name struggling to survive, but recently turning the corner, and one company whose namesake is known worldwide as the decorating doyenne. In spite of all the publicity and notoriety that this matter has garnered, these actions, at bottom, are classic, straightforward disputes involving breach of contract and tortious interference with contract.

What sets these disputes apart from the classic case are the stakes. The issues presented by these actions affect economic issues such as, but not limited to, employment, manufacturing, and distribution, both domestically and internationally. Indeed, the parties, which operate retail businesses in the traditional business model, are not only competing amongst themselves for consumers, but face an unidentifiable challenger that has no walls, no cash registers, and no check-out lines—the Internet. Clearly, the economic and financial stakes for all involved are incredibly high.

## The Parties

Plaintiff, Macy's, Inc. (Macy's), is a Delaware corporation with corporate offices in New York and Ohio, and is a national chain of department stores operating more than 850 department stores in 45 states. It also has a significant Internet presence operating under the names "Macy's" and "Bloomingdale's."

Plaintiff, Macy's Merchandising Group, Inc. (MMG), is a Delaware corporation with its principal place of business in New York. MMG is a wholly-owned subsidiary and affiliate of Macy's, and is responsible for the design, development and marketing of Macy's private label brands and certain licensed brands.

Defendant, J.C. Penney Corporation, Inc. (JCP), is a Delaware corporation with its principal place of business in Texas. JCP operates more than 1,100 department stores throughout the Unites States and Puerto Rico, and has a significant Internet presence operating under the name "J.C. Penney."

Former defendant, Martha Stewart Living Omnimedia, Inc. (MSLO), is a Delaware corporation with its principal place of business in New York. MSLO is a diversified media and merchandising company founded by Martha Stewart in February 1997. Martha Stewart is the public face of MSLO. On January 9, 2014, following trial but before my decision, Macy's discontinued its action against MSLO.

## Findings of Fact

## Conclusions of Law[*]

### The Origins of the Macy's/MSLO Agreement

By the early 1980s, Martha Stewart had become well-known in the domestic arts through newspaper columns, cookbooks, and television appearances. With her celebrity status rising, Ms. Stewart in 1987 contracted with Kmart to serve as its consultant and spokeswoman. Ten years later, Ms. Stewart's company, MSLO, entered into a contract with Kmart for the sale of Martha Stewart-labeled merchandise in bed and bath, housewares, holiday and outdoor categories under the brand name "Martha Stewart Everyday." Her merchandise soon after became the dominant brand at Kmart. That business relationship, however, began to sour. Over the ensuing years, Kmart sought to reduce MSLO's royalty payments, and MSLO became increasingly concerned with the appearance of Kmart's stores and quality of the merchandise bearing Ms. Stewart's name.

In 2002, both Kmart and Ms. Stewart encountered their own difficulties. Kmart filed for chapter 11 bankruptcy and the United States Securities and Exchange Commission began

---

[*] I tried these consolidated actions without a jury from February 19 to April 23, 2013. Unless otherwise noted, I base my findings of fact and conclusions of law on the preponderance of the evidence.

investigating Ms. Stewart for alleged insider trading violations. By the middle of 2003, as a result of a criminal indictment, Ms. Stewart resigned as MSLO's chairwoman and chief executive officer. In March 2004, the United States government obtained a conviction against Ms. Stewart for obstruction of justice and other felony counts. She began a period of incarceration later that year. In that same time period, Ms. Stewart engaged Charles Koppelman to look after MSLO during her prison term. With the Kmart business relationship deteriorating, Mr. Koppelman, who has experience in running troubled corporations, reached out to Terry Lundgren, Macy's CEO, to gauge Macy's interest in a proposed licensing arrangement for home merchandise with MSLO. The overtures went nowhere.

In 2005, Robin Marino, MSLO's new president of merchandising, reached out to Macy's again. Ms. Marino began her career at Macy's after college, and worked her way up through the ranks in her 11 years at Macy's. She wanted to move the MSLO brand upscale and believed Macy's would be an ideal partner. This time Macy's did not reject the overtures. The parties' negotiations bore fruit, but only after protracted and lengthy discussions. Ms. Marino led the negotiations for MSLO; Janet Grove, MMG's chairperson, and Leonard Marcus, its president and chief operating officer, led the negotiations for Macy's. Macy's had many concerns. To begin, there were significant risks in entering into a relationship with MSLO because the Martha Stewart brand had been associated with low-price, low-quality goods as a result of MSLO's association with Kmart, and because of Ms. Stewart's trial and conviction for securities law violations. Also, Macy's had concerns that there had been no business model for successfully bringing a mass-market brand upscale of the likes of Martha Stewart. Mr. Marcus was skeptical of the volume of sales MSLO could generate at Macy's; skeptical of the ability to move the Martha Stewart brand upscale; and ever skeptical and concerned that if Macy's succeeded in moving the brand upscale MSLO would seek to take advantage of that success, brought on by Macy's singular efforts, to sell its designs to a broader market (trial tr at 198, line 22 through 200, line 12). Indeed, the contemplated business arrangement had Macy's taking on all the financial risks, i.e., product demand reduction, consumer dissatisfaction (*id.* at 209, line 20 through 210, line 22). To call Mr. Marcus a "doubting Thomas" about the impending business relationship would be putting it mildly.

After months of negotiations, the parties were able to settle on the terms of a license and promotion agreement (the Macy's/ MSLO agreement). Broadly speaking, the terms included a minimum annual royalty; a condition that once the Kmart deal expired Macy's would have full exclusivity in the categories set forth in the Macy's/MSLO agreement; and that Macy's would have the unilateral right to renew the Macy's/MSLO agreement for a term of up to 20 years. The essence of the deal, however, was exclusivity:

> "Q So, Mr. Marcus, what were your negotiations about exclusivity?
>
> "A What we discussed was that Mr. Koppelman and Robin Marino knew how strongly we felt that if we went into a deal, Macy's could be the only person where Martha Stewart product in our categories could be sold, that she would design for us, but it had to be totally exclusive for us, and that we couldn't ask for total exclusivity, we carved out these categories, so Mr. Koppelman then said: We can't give you everything because we want to have—we already have some deals in place and, two, there are certain categories where Macy's doesn't do a lot of business, so we carved out categories and said— cookware, as an example, so anything to do with cookware was going to be exclusive to Macy's.
>
> "Q Now, when you say 'exclusive to Macy's,' what do you mean?
>
> "A That customer—the only place you can buy it would be at a Macy's, that we would be the—they would design it, we would be the only ones who could manufacture it, we could be the only ones to distribute it, we could be the only one to retail it and promote it, and they would come to Macy's" (*id.* at 207, line 25 through 208, line 20).

As for design exclusivity, Mr. Marcus gave the following testimony:

> "Q Now, did MSLO ever ask for the right to design in your categories for anybody else?
>
> "A Never. It would have been a deal breaker. The whole concept was, they were going to bring the whole—from the very first discussion, Martha brings incredible design talent, Macy's brings incredible manufacturing sourcing and distribution expertise and store expertise and customer market-

ing, and it's a win/win for both companies. That was at the very heart from the Day One they give us their designs, they never would have—they never asked to design for anyone else, and frankly that would have been another show stopper, that wouldn't have done the deal" (*id.* at 210, line 23 through 211, line 9).

## Macy's Launches the Martha Stewart Collection

In September 2007, with much fanfare and excitement, Macy's unveiled its new venture with MSLO. At its iconic flagship store in Herald Square, Macy's devoted its entire window display to Martha Stewart, and spent substantial monies to bring its store in line with Ms. Stewart's tastes (trial tr at 372, line 23 through 373, line 8; at 944, line 2 through 944, line 9). In that regard, Macy's painted the store walls "Martha blue" and added new fixtures (*id.* at 372, line 23 through 373, line 8). Macy's featured Ms. Stewart on Macy's website and advertised Macy's new venture with Ms. Stewart in a number of ways (*id.* at 944, line 20 through 945, line 6; at 945, line 11 through 945, line 19). Macy's "wanted to create a whole world, a whole world shop of Martha Stewart" (*id.* at 367, line 17 through 367, line 24). Despite the excitement, the first 18 months of sales were disappointing—"a disaster" (*id.* at 394, line 23). Nonetheless, Macy's continued to work with MSLO to get through the growing pains and to add more advertising monies to attract consumers. The efforts bore fruit. Every year since 2008, sales for the Martha Stewart Collection have increased annually so that it has become the leading brand in Macy's Home Store. All appeared to be well.

## The Genesis of the JCP/MSLO Agreement

Notwithstanding MSLO's strength and success in merchandising, it suffered heavy losses in its media business. In order to stabilize its finances and to obtain further financing, MSLO's board of directors (MSLO board) established a special committee in the spring of 2011 to explore "strategic partnerships." The special committee retained The Blackstone Group to lead the search. MSLO did not confer with Macy's about a strategic partnership.

Coincidentally, on June 14, 2011, JCP announced that it had hired Ron Johnson as its new CEO. Mr. Johnson, with the support of JCP's board of directors (JCP board), had a new vision for the company. In that regard, he was drawing on his extensive

experience in merchandising at Target, and his successful development and implementation of the Apple Store. To that end, he viewed Martha Stewart as the key to that vision, and testified that she would be a "game changer" for JCP (trial tr at 1319, line 2 through 1319, line 5). He also believed that Martha Stewart's influence on the Home industry has been tremendous and greater than any single designer in the Home apparel industry (*id.* at 1238, line 18 through 1238, line 24). Indeed, Ms. Stewart herself attested that she provides MSLO "guidance, overall strategy, overall design sensibility, and likability of designs" and is "the uber designer, uber leader, uber teacher" for MSLO (*id.* at 1649, line 14 through 1649, line 16; at 1719, line 2 through 1719, line 3). Holding those firm beliefs, Mr. Johnson set off to land Martha Stewart.

On August 8, 2011, with Blackstone's assistance, Mr. Johnson met Ms. Stewart for the first time. MSLO never sought permission from Macy's to meet with JCP (trial tr at 1684, line 5 through 1684, line 7). Accompanying Ms. Stewart was Lisa Gersh, MSLO's new CEO. Ms. Stewart characterized Mr. Johnson's statements made during the meeting as "very flattering" and "very appealing," and, more importantly for MSLO's purposes, eagerly agreed with Macy's counsel's description of the meeting as being very "enticing" (trial tr at 1672, line 16 through 1672, line 25). What was plainly obvious to Mr. Johnson and his JCP team was the fact that the sole obstacle to their planned business relationship with MSLO was the Macy's/MSLO agreement. Indeed, the "impediment" was that the Macy's/MSLO agreement covered the same product categories that JCP wanted to develop with MSLO, and that the Macy's/MSLO agreement purportedly gave Macy's exclusivity over these categories (trial tr at 1274, line 4 through 1274, line 22). Indeed, in an August 17, 2011 email, Mr. Johnson wrote to Daniel Walker, another JCP executive:

> "I'm feeling awesome about grand strategy. I need to pull off Martha. She wants to do it . . . I need to propose a deal so she can go to Terry L [Lundgren] at Macy's and break their agreement. That is the only issue in way of success at this point" (P140 at 1 [ellipsis in original]).

In reply, Mr. Walker emailed, "Getting Martha landed will give you the cornerstone that you'll need" (*id.*). Mr. Johnson was also aware of Macy's unilateral renewal right, which was quickly approaching its deadline in January 2012. To that end, he wrote

an August 14, 2011 email to Steve Roth, another JCP board member: "Macy's deal is key. We need to find a way to break the renewal right in Spring 2013" (P139 at 1). Mr. Roth agreed (*id.*). Armed with the full support of the JCP board, Mr. Johnson and his JCP team pressed on for a solution. Indeed, without an opening, JCP and MSLO could not consummate their planned business venture.

## JCP's Grand Strategy

Prior to hiring Mr. Johnson, JCP had contracted with Sephora to open shops inside JCP. Sephora had already operated many freestanding retail stores, and JCP modeled the shops inside its stores on fixtures and inventory after the Sephora stores. Mr. Johnson wanted to take this "store within a store" concept to another level. His vision of JCP's "grand strategy" was to have JCP stores organized by brand shops, and he testified that this strategy was undertaken to reinvent JCP stores by opening individual stores and boutiques inside them (trial tr at 1231, line 9 through 1232, line 9). JCP planned to have 100 such shops, with 20 in the Home area alone. The anchor for these shops would be a Martha Stewart shop, which was particularly critical because of its established appeal. According to Mr. Johnson, that appeal would drive foot traffic and produce "halo sales," i.e., consumers buying other items (trial tr at 1239, line 6 through 1240, line 8).

## The Loophole

Despite the perceived contractual obstacle, with the assistance of Blackstone, JCP's negotiations with MSLO were progressing well enough for Mr. Johnson to write an August 31, 2011 email to Steve Seabolt, another JCP executive: "The ball is in her court now to talk to Macy's about a break in a tight, exclusive agreement they have with her. This will be a difficult issue as they see JCP as their primary competitor" (P142 at 1). Thus, Mr. Johnson was of the belief that MSLO would have to negotiate with Macy's to resolve what MSLO could agree to do in a contract with JCP (trial tr at 1274, line 18 through 1274, line 22; at 1397, line 9 through 1398, line 11). He was optimistic that Macy's would support MSLO's new relationship with JCP to the point of writing in an email to Steve Seabolt, a JCP executive, "Terry L [Lundgren] is a good friend and will want to support her" (P142; trial tr at 1406, line 20 through 1406, line 22; at 1407, line 7 through 1407, line 13). Subsequent events would demonstrate that Mr. Johnson was overly optimistic.

In late August 2011, MSLO hired Daniel Taitz, a former law partner of Ms. Gersh, as its general counsel. With an understanding of JCP's grand strategy, he theorized that opening a Martha Stewart shop within a JCP store would be permitted under the Macy's/MSLO agreement (trial tr at 2527, line 8 through 2530, line 6). He told JCP of his interpretation and understanding of the Macy's/MSLO agreement (id.).

On September 20, 2011, Mr. Johnson met again with Ms. Stewart and Ms. Gersh, who told him of Mr. Taitz's theory. In an email of the same date, Mr. Johnson wrote to his team:

> "A big breakthrough . . . Martha's lawyers have determined that they can do Martha Stewart Stores which include 'Stores within a Store' . . . so like Sephora we have a path should Terry [Lundgren] not be amenable.
> "We should obviously validate all this but they are exceedingly interested in making this happen" (P147 [ellipses in original]).

Confidence in this interpretation, however, was tepid. In reviewing the "MSLO Store" provision set forth in the Macy's/MSLO agreement, Katheryn Burchett, JCP's senior vice-president of merchandising and marketing integration and one of JCP's lead negotiators, became concerned that the Martha Stewart store within a store exception might not hold up (trial tr at 2324, line 16 through 2324, line 21). Mr. Taitz thought otherwise. In response to why MSLO did not want to indemnify JCP, he believed that the "likelihood that someone would later view this as a breach was a very low probability," but he thought that "it was a very high probability that Macy's would attack it" (id. at 2536, line 2 through 2536, line 6). He held firm the belief that MSLO could open a store within JCP and not run afoul of the Macy's/MSLO agreement. Simply stated, Mr. Taitz's testimony is that MSLO was right, but that Macy's would not like it. As to the latter sentiment, he could not be more ac-curate. The former sentiment is less absolute as the unfolding events would later prove.

In the midst of these quickly developing events, JCP and MSLO decided to approach The Home Depot, one of MSLO's major retail partners, for consent, which they obtained (trial tr at 1432, line 14 through 1433, line 14). That was not the same approach taken with Macy's (id. at 1433, line 15 through 1434, line 2). Charles Koppelman, who viewed MSLO's relationship with Macy's as intimate and trusting, growing out of their

mutual objectives to build their businesses, advised MSLO and Ms. Stewart to inform Macy's as they did with The Home Depot, and thought that not to do so would be a mistake (*id.* at 1989, line 13 through 1989, line 17). MSLO and Ms. Stewart did not heed his advice (*id.* at 1999, line 14 through 2000, line 3). In November 2011, MSLO and JCP agreed that Macy's would not be told until after they signed their agreement (P188 at 1). Hindsight is always "20/20" vision—MSLO and Ms. Stewart should have heeded Mr. Koppelman's wise counsel.

### The Dramatic Fallout

On December 6, 2011, JCP and MSLO entered into a licensing agreement, with JCP board's approval (P92; P9). Ms. Stewart broke the news to Mr. Lundgren on the evening of December 6. To say that Macy's was shocked and surprised would be an understatement. His testimony is as follows:

"Q December 6, 2011, do you remember a conversation with Ms. Stewart at that time?

"A Yes, I do.

"Q Tell the court if you could what happened.

"A I was traveling that day. I landed and had a message from my assistant who said: Please call Ms. Stewart. She would like to talk to you tonight. And this was about—I landed something like 6:00 p.m., so I called her right away.

"And she put me on the speakerphone with her relatively new president Lisa Gersh, I had never met her, but she was the president, the two of them, and she started talking to me about this new relationship that she was about to announce the next morning, and she said it will be with J.C. Penney, and they have taken an interest in her company.

"And I was completely shocked and blown away by what she was saying to me. It was so far from anything that I could ever imagine. I was in complete shock, and I was totally disappointed, why she would. And I said: Why wouldn't you bring this to me? Why wouldn't you come and talk to me about this? I mean, Martha, we're business partners, we're friends. I think. And: Well, I couldn't do it, she said, because it was confidential, we had a confidential agreement with Penney's, so I was not allowed to talk to you. That was her response.

"And so then she went back to—and it seemed to

me like she was reading a document when she was on the phone. So I said, you know—which sounded like it was prepared by lawyers frankly, and so I said, after some minutes, I finally said: This conversation is over, and I hung up the phone. I can't remember ever hanging up on anyone in my life, but that's how frustrated and disappointed I was with Martha Stewart with that phone call, and so I did hang up on her.

"Q Did she say the effect that this would have on Macy's?

"A She said this was going to be good for Macy's. I think that's when I hung up actually, because the thought of how this could be good for Macy's was just so far away from anything that I could comprehend and still could comprehend. I think that's the point when I hung up" (trial tr at 580, line 24 through 582, line 10).

Macy's counsel then read the following to Mr. Lundgren, which was an email Mr. Lundgren wrote to Jim Slucewski, Macy's communications person, right after his telephone conversation with Ms. Stewart:

"They will open Martha shops in their stores and do an online catalogue with crafts and other Martha products. She hopes we will continue to support her. I told her I was shocked, appalled and disgusted that she would not come to us first with the opportunity to counter, especially since her business problems have nothing to do with us. We have done everything for her and been totally loyal. She said they had to do something since the company is failing, with negative earnings, and she couldn't talk to us during the process since it was confidential. She wants to come in and talk face to face, but I told her I was busy with the board meeting and need time to digest this.

"How were you feeling as you wrote this e-mail?

"A As the words say, I was very upset. This was such a shock to me, and I was certain it was going to be a shock to my executive team who had this relationship with the company and with Martha herself. So I was literally sick to my stomach about this. It was just something I couldn't imagine" (*id.* at 584, line 5 through 584, line 22).

The entire Macy's team shared those sentiments when they

heard the news. Laurene Gandolfo, MMG's executive vice-president for Home Private Brands, who worked primarily with MSLO, bluntly stated, "it was really emotional, [an] emotional moment," "I felt like somebody just stabbed me in the heart, and I didn't know why," "I was working with [Martha and MSLO]," "I trusted [Martha and MSLO]," and "I was trying to help, and I felt like [Martha and MSLO] stabbed me in the back" (*id.* at 440, line 19 through 441, line 6; at 445, line 7 through 445, line 9).

On December 7, 2011, JCP and MSLO publicly announced their new business relationship: MSLO had entered into what it called a "strategic alliance" with JCP (P9). Pursuant to this "strategic alliance," JCP would purchase a 16.6% equity stake in MSLO and receive two seats on the MSLO board in exchange for a $38.5 million investment in the company. MSLO and JCP also announced their abovementioned licensing agreement, dated December 6, 2011 (the JCP/MSLO agreement).

## The Aftermath

JCP's view of what had transpired over those last two days can be described as nothing short of sophomoric. Incredibly, ignoring the seriousness of what had just transpired, Mr. Johnson wrote to William Ackman and Steven Roth, JCP board members who controlled the largest and second largest blocks of JCP shares, respectively, the following emails:

To Mr. Ackman: "Media good as well. We put Terry [Lundgren] in a corner. Normally when that happens and you get someone on the defensive they make bad decisions. This is good" (P199 at 1).

To Mr. Roth:

> "Terry clearly stewing . . . he might simply walk. I'm inclined to let the press run and let him stew for a bit. The more this is seen as brilliant for JCP and Martha the more he won't want to interfere. He will say 'go to the masses . . . I'm too good for her.' Thank you for your help on getting this accomplished" (P472 at 2 [ellipses in original]).

A number of other emails from that time period among senior executives at JCP—Mr. Johnson, Steve Lawrence, and Michael Francis—expressed unabashed giddiness at the discomfort they thought the JCP/MSLO agreement would bring to Macy's:

From Steve Lawrence to Mr. Johnson: "I appreciate your support and I am excited to be part of the team that will re-shape

department store retail. On a side note, sounds like Macy's is pretty unhappy with the Martha deal . . . : -('' (P203 [ellipsis in original]).

From Mr. Johnson to Steve Lawrence: "I am so sad . . . It is always good to be playing offense. I like the fact that we have everyone watching and paying attention. I'm sure Macy's is in shock . . . and it must be a bit embarrassing. They look asleep at the wheel" (*id.*).

From Mr. Johnson to Michael Francis: "Terry might have a headache tonight . . . wait until 1/24. It will be a full on migraine :)"

From Mr. Francis to Mr. Johnson: "I think Terry is more likely to race past migraine into grand mal seizure!" (P200 at 1 [ellipses in original].) Such childish behavior displayed by these individuals is unbecoming of top executives of a major corporation, and is nothing to be proud of, particularly given the stakes. Putting that behavior aside, the clear aim of such incredible pressure was to push Macy's and Mr. Lundgren in the direction that they had taken with Liz Claiborne, namely, to walk away from Macy's right of renewal with MSLO, which is why JCP and MSLO provided for sales to begin in February 2013, immediately after the expiration of the first five-year term of the Macy's/MSLO agreement. Unbeknownst to Mr. Lundgren and Macy's, Mr. Johnson's attitude towards them with respect to JCP's budding relationship with MSLO was take it or leave it. Mr. Johnson aptly described the scene as making JCP's "offensive so strong" that Macy's would "simply pick up their toys and go home" (P204 at 1). JCP and Mr. Johnson could not have been more wrong.

Faced with this Hobson's choice, Mr. Lundgren exercised Macy's renewal right, which Ms. Stewart expressly accepted, and commenced litigation against MSLO and JCP to enforce and protect Macy's contractual rights.

## The Claims

Macy's asserted two causes of action against MSLO: (1) breach of contract in that MSLO, in derogation of its duty of good faith and fair dealing, challenged Macy's unilateral renewal rights pursuant to the Macy's agreement; and (2) breach of contract in that MSLO disclosed to JCP confidential information in violation of section 22 (a) of the Macy's agreement.

As against JCP, Macy's asserted three causes of action: (1) tortious interference with Macy's contract by inducing MSLO to

challenge Macy's unilateral renewal rights under the Macy's agreement; (2) tortious interference with section 22 (a) of the Macy's agreement by inducing MSLO to disclose to JCP confidential information; and (3) unfair competition.

## Strange Bedfellows

After entering into the JCP/MSLO agreement, and subsequent to Macy's commencement of its action against MSLO, JCP and MSLO took steps to implement the terms of their agreement. In particular, they began conceptualizing and designing the MSLO Store within JCP. By spring of 2012, Black, Inc., a design firm, had created conceptual designs for a large, four-walled, freestanding, prominently branded Martha Stewart store inside JCP with sections dedicated to Martha Stewart kitchen, bedding, and bath products (trial tr at 2098, line 17 through 2099, line 25; at 2101, line 2 through 2101, line 5; at 2129, line 2 through 2129, line 20; D J-9 at 5, 7-14).

In addition, the product development process "started right away" (trial tr at 2135, line 3 through 2135, line 16). Between December 2011 and July 2012, MSLO developed and provided JCP approximately 900 designs for products within Macy's exclusive product categories (*id.* at 2662, line 24 through 2663, line 2). The parties do not dispute that when MSLO created those designs, and when JCP received them, both MSLO and JCP intended that the designed products would be branded with a Martha Stewart trademark pursuant to the JCP/MSLO agreement (*id.* at 1487, line 3 through 1487, line 11; at 1574, line 22 through 1574, line 26).

At the same time, while all this activity was going on between MSLO and JCP, MSLO continued to work closely with Macy's to develop designs for Macy's 2013 season, providing all the designs that Macy's requested and needed (trial tr at 463, line 21 through 463, line 23; at 2572, line 23 through 2573, line 6). In fact, shortly before trial of these actions began, Ms. Gandolfo informed Patsy Pollack, MSLO's senior executive vice-president of merchandising, that the 2012 design presentations were the best that she had ever seen from MSLO (*id.* at 2573, line 7 through 2573, line 22).

## The Judicial Proceedings

### The July and August 2012 Preliminary Injunction

On July 13, 2012, after oral argument, I granted Macy's motion for a preliminary injunction against MSLO. Specifically, I

enjoined and restrained MSLO during the pendency of Macy's action against it from

> "[p]erforming under, or taking any steps in further-ance of, the agreement between MSLO and J.C. Pen-ney Corporation, Inc., dated December 6, 2011, and any amendments thereto (the 'JCP/MSLO Agree-ment'), as it relates to the manufacture, marketing, distribution, or sale of any Martha Stewart-branded products in the following categories, denominated as the Macy's 'Exclusive Product Categories' in the License and Promotion Agreement between MSLO and Macy's Merchandising Group, Inc., dated April 3, 2006, as amended (the 'Macy's Agreement'): Soft Home (bedding, bath and kitchen textiles); House-wares (dinnerware, tabletop and gadgets); Home Décor (candles and frames); Cookware; and Furni-ture (subject to the provisions of the Third Amend-ment to the Macy's Agreement, dated December 20, 2010)" (order, entered July 31, 2012, at 2).

On August 30, 2012, I heard arguments on Macy's motion for a preliminary injunction against JCP. During oral argument, I was compelled to make the following observation:

> "You know, that brings me back to the point that we had with respect to Macy's versus MSLO, and that is, you three companies going at it like this—these are three blue chip companies on the stock exchange, publicly traded companies that are really, you know, part of the fabric of this country here. And to have them go into this nasty fight right now about contracts, about the money, basically, is not a good thing for the economy. Not only are vendors confused, but you have workers and employees that are concerned as to what is going on because, you know, hearing from the financial world . . .

> "J.C. Penney right now is fighting, at least from a casual observer, fighting to survive at this point. I mean, you turn the pages of the Financial Times or the financial news and Mr. Johnson is batting away, trying to resurrect J.C. Penney.

> "Macy's, if I do recall, back in the '80s and '90s ran into some troubles too with Federated Stores. They were almost on the verge of bankruptcy. You can understand your client, Mr. Terry Lundgren, can understand the complexities and difficulties that J.C. Penney is facing now.

"At this point you're asking me to enjoin them from conducting a business of surviving basically, trying to survive. I'm not sure I am buying that at this point because they have already said in their papers that they are more than, they are trying very hard to comply with my injunction or the injunctive order that's out there, that they are willing to, they have stopped production on putting marks on Martha Stewart products. They are willing to get all these products without any marks on them and sell them" (Aug. 30, 2012 hearing tr at 11-12).

In the end, I denied Macy's motion for a preliminary injunction against JCP, particularly in view of JCP's voluntary agreement to abide by the terms of the preliminary injunction issued against MSLO. In that regard, JCP represented to me that it "will not manufacture or sell any Martha Stewart branded product in the Exclusive Product Categories as long as MSLO is subject to [the] preliminary injunction restrictions" (Aug. 30, 2012 hearing tr at 74). Indeed, I found such representation to be "a sufficient enough safety for Macy's, to assure Macy's that it won't be harmed at this juncture" (*id.*).

### The April 2013 Preliminary Injunction

In accordance with my preliminary injunction order, and JCP's agreement to abide by that order, JCP stopped orders for "Martha Stewart"-branded products in the exclusive product categories, but began a process for placing orders to manufacture the products branded with the "jcp Everyday" mark along with the "Double House" logo (the JCP products) (trial tr at 1489, line 14 through 1489, line 19).

On April 12, 2013, at the close of Macy's case-in-chief, Macy's made another application for a preliminary injunction against JCP, which was necessitated because JCP sought to sell the JCP products. Macy's also sought additional injunctive reliefs against MSLO.

As for MSLO, I granted Macy's motion to the extent of incorporating my prior preliminary injunction order it obtained against MSLO. Concerning JCP, my decision was as follows:

"Suffice it to say I've heard the arguments today. I've been sitting on this trial for almost four weeks, and I'm really disappointed that we've gotten to this point where three, I think, very legitimate retail operations, businesses, could not arrive at some business decision to resolve this issue.

"I have thought long and hard about this issue and have kept an open mind on this particular issue with the preliminary injunction, as you can see during the arguments that we've had, based on my questions—and they were hard questions for both sides, because I've been thinking a lot about this case and thinking about this issue.

"Without question, the arguments I've heard today, both from Mr. Grossman, Mr. Epstein and Mr. Seiler, they've been very emotional and very strong for each side. They've advocated very hard for each side.

"I go back again that, you know, these retail giants—and I don't use the word 'giants' in a glib form. They are a big part of this country. They drive the economic engine of this country.

"They're part and parcel of the retail industry because everybody sort of takes their queue from these three companies.

"I'm still of the belief that business decisions are best made by business people, particularly and especially when it comes to retail.

"But having said that, this is my decision concerning Macy's application for a preliminary injunction against J.C. Penney . . .

"There are three factors that Macy's must satisfy: 1, likelihood of success on the merits, 2, irreparable harm, and 3, balance of the equities.

"On the issue of the likelihood of success on the merits, I do not reach that issue and make no determination.

"I took no arguments on that issue, but the parties are free to press that issue on appeal. The appellate court has fact-finding authority and may decide that issue.

"However, I incorporate the July 13, 2012 proceedings [and] the July 30, 2012 order where I addressed the issue on the likelihood of success on the merits, and it still stands in that regard.

"Turning to the irreparable harm, that issue was, clearly, hotly disputed. On this record I find that Macy's has not demonstrated irreparable harm.

"I find that the injury Macy's may sustain—and I underscore the word 'may'—sustain is economic in nature and can be compensated by money damages.

"The basis of my decision on this issue can be gleaned from my statements on the record, and I need not repeat them.

"To the extent Macy's argued that the contract it has with MSLO addresses this injunctive relief, I find that it's inapplicable because J.C. Penney is not a party to that contract and cannot be deemed to have agreed to that provision or can be deemed to be an agent or affiliate of that agreement such that the injunctive provision in the MSLO contract could be applied to J.C. Penney.

"Turning to the equities, I had much difficulty with deciding this issue, given the trial record.

"It's clear, as Mr. Grossman pointed out to me, and I don't find it at all questionable, that the conduct perpetrated by Ron Johnson may have been less than admirable in this regard.

"But having said that, J.C. Penney's decision to produce the nonbranded products from MSLO designs was not specifically barred by this court.

"Indeed, Macy's had sought that prohibition, but I declined to do so.

"So in that regard all the argument about how J.C. Penney did what it did, and it was in violation of my order, I didn't specifically bar them.

"They took a risk, and they did it, and they took the nonbranded products, and they manufactured the nonbranded products. That was a risk they took. I'm now called upon to decide that issue, but I'm finding here that they did not violate my order.

"It's clear that if they were going to sell branded products, they would be yanked off the shelves, but the nonbranded products were not specifically precluded, or they were not specifically barred from manufacturing them.

"Further, as to equities, I cannot ignore the reality of the harm to J.C. Penney, even if it is the result of their own acts.

"But the acts, I believe, were spurred on by their former CEO, who is no longer at J.C. Penney.

"So now they have to live with the fact that they have this situation that's been created and there may be a change in the corporate climate.

"But having said that, there will be measurable col-

lateral damages, in my mind, based on the affidavits that I have and based on this record that I have heard already at this trial.

"To J.C. Penney, if I grant this injunction against them, I, again, rely on the arguments herein for the specific harms that are set forth [in] this record and the arguments that we have, and I'm not going to specifically lay them out, but they're here.

"Here, again, I have to draw the analogy that it is not like having a building torn down. Once the building is torn down, there is no way that that building can be rebuilt the same way that it was before it's torn down.

"This is a purely economic situation. I am quite confident and satisfied that when J.C. Penney put the products on the shelves and sought to sell the products, I am quite confident that the experts are going to be able to do a regression analysis and figure out the lost profits and what losses that Macy's may sustain, and they could be substantial, or may not be, but I'm quite confident that the economic realities are such that I will be able to assess the damages against J.C. Penney in the event Macy's prevails in its tortious contract claim against J.C. Penney.

"Turning to the status quo, that is the prime purpose of a preliminary injunction to maintain the status quo.

"I find that the status quo will not be changed, no matter how much Macy's argues to the contrary, because the bottom line is, at bottom, there will be no MSLO branded goods at all at J.C. Penney within the Exclusive Product Category that's going to be sold.

"These are unbranded at least in my mind, branded with the J.C. Penney Everyday logo. That's a far cry from being branded with the Martha Stewart logo.

"Having said all that, that is my decision and order with respect to the injunction.

"So, that branch of the motion for a preliminary injunction against J.C. Penney is denied" (Apr. 12, 2013 trial tr at 116-122).

Thereafter, Macy's made an immediate application to the Appellate Division, First Department for a preliminary appellate

injunction against JCP. The First Department unanimously denied Macy's motion (2013 NY Slip Op 72578[U] [Apr. 30, 2013]).

## Trial Proceedings

On April 10 and 11, 2013, at the close of Macy's case-in-chief, MSLO moved to dismiss the two causes of action asserted against it. I granted it to the extent of dismissing Macy's second cause of action against MSLO for its purported breach of section 22's confidentiality clause by disclosing to JCP confidential information set forth in the Macy's agreement. I denied the motion to dismiss Macy's first cause of action. The theory of that first cause of action evolved over the course of the trial. In the end, Macy's contended that MSLO breached the Macy's/MSLO agreement by designing products in the exclusive product categories for sale at JCP, and by seeking to have JCP sell Martha Stewart-branded products in the exclusive product categories in MSLO Stores within JCP stores.

On April 12, 2013, I granted JCP's motion to dismiss the second cause of action for tortious interference with section 22 of the Macy's agreement in light of my decision to dismiss Macy's claim against MSLO for its breach of section 22 of the Macy's agreement. I also granted JCP's motion to dismiss the third cause of action for unfair competition. JCP did not move to dismiss the first cause of action for tortious interference with Macy's contract with MSLO.

I heard closing arguments on August 1, 2013. The place settings have dramatically changed since that time.

## The Game Changer

While this matter was sub judice, two significant events took place. The first was MSLO's Form 8-K filing, dated October 21, 2013, with the Securities and Exchange Commission. I take judicial notice of this official document. In that filing, MSLO provided the following statement:

> "On October 21, 2013, Martha Stewart Living Omnimedia, Inc. (the 'Company') and J.C. Penney Corporation, Inc. ('JCP') entered into the Third Amendment (the 'Amendment') to the JCP/MSLO Agreement dated December 6, 2011 (the 'Commercial Agreement').

> "Pursuant to the Amendment, the Company and JCP agreed that JCP would no longer manufacture

and sell Company branded products in product categories subject to a third party litigation and would continue to manufacture and sell Company branded products in the non-exclusive product categories set forth in the Amendment, such as windows, lighting and rugs. Further, the Amendment provides that JCP will pay the Company design fees for the remaining product categories for a period of four years and guaranteed minimum royalties for a period of four and a half years, with an upfront payment of the first year guaranteed minimum royalties. The term of the Commercial Agreement was also revised to expire on June 30, 2017.

''The Amendment also provides for the return of the 11,000,000 shares of Class A Common Stock, par value $0.01 per share, of the Company held by JCP (the 'Returned Shares') and the one (1) share of the Company's Series A Preferred Shares, par value $0.01 per share, held by JCP (the 'Series A Preferred Stock'). Upon surrender by JCP of the Returned Shares, the Series A Preferred Stock was cancelled by the Company in accordance with Section 4 of the Certificate of Designations of Series A Preferred Stock (the 'Certificate of Designations'). Concurrently with the Amendment, the parties also entered into a Mutual Release of Claims (the 'Mutual Release') with respect to the parties' obligations under the Commercial Agreement that were subject to legal challenge as well as the related third party litigation.''

Thus, JCP will no longer sell any products designed by MSLO—branded or unbranded—in the exclusive product categories. Put simply, JCP's deal with MSLO was over.

The other significant event was Macy's decision to settle its dispute with MSLO. On January 9, 2014, I so-ordered a stipulation and order of severance and voluntary discontinuance of Macy's action against MSLO. Macy's discontinuance against MSLO was with prejudice.

Macy's, however, has not been as magnanimous with JCP. Macy's continues to assert that JCP is liable to it for tortious interference with its contract with MSLO. In light of these significant developments, Macy's and JCP at my direction submitted supplemental briefs to address the impact these developments would have on Macy's remaining claim against JCP. Macy's and JCP submitted these briefs on January 10, 2014.

## Analysis

### The Relevant Terms of the Macy's/MSLO Agreement

The Macy's/MSLO agreement, dated April 3, 2006, provided for an initial five-year term, a unilateral renewal right to Macy's for an additional five-year term, and five additional two-year renewal terms (P1). While the agreement granted Macy's a license for certain Martha Stewart marks and certain designs created by MSLO in collaboration with Macy's, MSLO retained ownership of its designs and its intellectual property.

Section 1 defines "exclusive product category" as items set forth in exhibit A to the agreement: soft home (bedding, bath and kitchen textiles), housewares (dinnerware, tabletop and gadgets), home decor (candles and frames), and cookware. That section also sets forth the definitions of key terms. "Exclusive Product" means "those products in the Exclusive Product Categories that are branded under the Trademark, manufactured by [Macy's], and marketed and sold by [Macy's] or, under the conditions set forth herein, through an MSLO DTC Channel."

The key sections that are at the heart of this dispute are section 2, entitled "Grant; Exclusivity," which provides Macy's with licensing rights over the Martha Stewart marks, and section 4, entitled "Product Development and Design," which directs that "as an integral part of this Agreement" MSLO shall develop both "designs" and "concepts" for goods in Macy's exclusive product categories. That section further directs that MSLO undertake this work "in collaboration with [Macy's]" and that "each Party's design personnel shall work in cooperation with each other and with the manufacturing personnel of [Macy's]." The exclusivity granted by MSLO to Macy's is subject to section 8, entitled "Manufacturing, Production, Projections and Distribution," which provides, inter alia, for the operation of an MSLO Store. Lastly, section 18, entitled "Additional Covenants," sets forth, inter alia, MSLO's noncompete obligations. Specifically, with the exception of an MSLO Store, section 18 (b) prohibits MSLO from entering in any agreement with "any department store or manufacturer or other retailer of department store merchandise" to compete with Macy's within the exclusive product categories.

### The Relevant Terms of the JCP/MSLO Agreement

The JCP/MSLO agreement provides that JCP would commence selling MSLO designed products bearing the Martha

Stewart marks in JCP department stores and through an independent e-commerce site that MSLO and JCP would jointly develop (P92). The agreement, like the Macy's/MSLO agreement, provides for MSLO to design and JCP to source and sell Martha Stewart-branded products in the Macy's exclusive product categories as well as in certain non-exclusive product lines. According to a press release, these products would be sold in "distinct Martha Stewart retail stores inside the majority of jcpenney department stores," and "J.C. Penney [would] market and source the products" (P9). The press release further stated that MSLO "expected to receive in excess of $200 million from J.C. Penney over the initial 10-year contract period" (*id.*).

The JCP/MSLO agreement also provides that JCP would pay for the design and construction of "MSLO Stores," which would then be a focal point for the JCP Home Store in approximately 600 JCP department stores (P92 §§ 4 [b] [i], [iii], [v]; 6 [a]). Additionally, the agreement provides that with respect to these stores JCP has the sole right to hire and terminate employees, that JCP would bear the expenses of the MSLO Stores, and that MSLO agrees not to open any MSLO Store that sells kitchen products or other products in any category that becomes exclusive to JCP. More specifically, JCP would source the Martha Stewart goods, own the inventory, sell the products in a space owned or leased by JCP, employ the sales personnel, book the revenue from the sales of products in the Martha Stewart stores, and essentially bear all the risks (trial tr at 1305, line 24 through 1306, line 19).

A careful review of the Macy's/MSLO and JCP/MSLO agreements demonstrates that they are irreconcilable and incompatible—both claim to have exclusivity over virtually the same product categories. In light of this conundrum, the question then is whether JCP can be held liable for tortious interference with Macy's contract with MSLO.

## I. Tortious Interference Claim

In order to establish this claim, Macy's must prove (1) that it had a valid contract with MSLO, (2) that JCP had knowledge of Macy's contract with MSLO, the specific terms of which need not have been known by JCP, (3) that JCP intentionally induced MSLO to breach its contract with Macy's, (4) that MSLO breached its contract with Macy's, (5) that MSLO would not have breached its contract with Macy's absent JCP's conduct, and (6) that Macy's sustained damages (*White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 NY3d 422, 426 [2007]).

This sole remaining cause of action is not your typical tortious interference claim. There is no dispute that MSLO has a contractual relationship with Macy's pursuant to the Macy's/MSLO agreement. Indeed, Macy's exercised its unilateral renewal right on January 23, 2012. As such, Macy's had and continues to have a valid, binding contract with MSLO, which under New York law is accorded greater protection in a tortious interference claim than to the less substantive interest in a mere prospective relationship (*id.* at 425). There is also no dispute that JCP had knowledge of the Macy's/MSLO agreement. Indeed, Mr. Johnson's testimony clearly demonstrated that that agreement was the roadblock to JCP's business relationship with MSLO and Ms. Stewart. JCP now argues in its supplemental memorandum of law that JCP's decision to amend its agreement with MSLO, essentially ending the basis for Macy's action against JCP and MSLO, and Macy's discontinuance of its action against MSLO, effectively puts an end to Macy's tort claim against it (JCP's supplemental mem regarding effect of contract modification at 13-14). That game changer does not, however, in any way alter what has happened. Indeed, JCP's "no harm, no foul" argument is simply untenable given the evidence in this case. To view otherwise would be to pretend that nothing ever happened, and all's well that ends well.

Although MSLO did not actually "break" its contract with Macy's, which facially undermines Macy's tort claim against JCP (*NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614, 621 [1996]), the questions to be decided are whether by entering into the JCP/MSLO agreement MSLO breached certain terms set forth in the Macy's/MSLO agreement, and whether JCP induced MSLO to enter the JCP/MSLO agreement. Of course, the threshold issue is whether there was a breach because without it Macy's tort claim must fail.

A. MSLO's and JCP's Omnibus Defenses

(i) The Good for Macy's Defense

MSLO's attempted justification that the JCP/MSLO agreement creating a "strategic alliance" with JCP would be "good for Macy's" is pure sophistry. Indeed, when Ms. Stewart made that point to Mr. Lundgren, his reaction was simple—he hung up on her. Likewise, Mr. Marcus testified that he recalled Ms. Gersh telling him that "some people believe" sales at Macy's "will actually go up" as a result of the "strategic alliance," but that he was unwilling to accept that "illogical" argument—as he explained, if a customer "can go to Penney's or . . . to

Macy's" to buy the same product, "[h]ow is that not going to hurt sales?" (Trial tr at 265, line 26 through 267, line 4.) Under these circumstances, I easily reject this defense.

(ii) Macy's Breached the Macy's/MSLO Agreement

If the "good for Macy's defense" is incredible, the next argument that Macy's breached the parties' agreement is disingenuous. Here, the trial evidence clearly establishes that MSLO did not enter into the JCP/MSLO agreement on the ground that Macy's was in breach of the Macy's/MSLO agreement, and MSLO raised this defense only after Macy's commenced this action against it. Indeed, if this defense were tenable, MSLO could have blocked Macy's January 23, 2012 renewal—section 3 (b) (i) bars Macy's renewal if it were in breach of the agreement. Rather, the trial evidence demonstrates that MSLO and Ms. Stewart were pleased with the renewal, publicly stating: MSLO has had a "very excellent relationship with Macy's" (P10), "[w]e love working with" Macy's (*id.*), "Macy's has been a very nice partner" and MSLO's relationship with Macy's "should continue" into the future (trial tr at 1658, line 21; at 1660, line 17 through 1660, line 19). Indeed, shortly after the renewal, Ms. Stewart proudly stated on CNBC that Macy's extended its contract with MSLO, and that it "now runs through 2018" (P10). With these undeniably consistent statements indicating that Macy's was not in breach of the Macy's/MSLO agreement, I reject this defense.

B. Breach of Contract

Although the parties focused much of their witnesses' testimony and trial evidence on what Macy's and MSLO wanted, intended, or believed to be the "essence" of the Macy's/MSLO agreement when the contract was negotiated, none of this evidence is relevant to the interpretation of the contract unless I first find that the agreement is ambiguous. The principle is well settled that parol evidence of what the parties intended cannot be considered when interpreting an unambiguous contract (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157 [1990]). Whether a contract is ambiguous is, of course, a question of law for a court (*South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 278 [2005]). A contract is ambiguous only if "on its face [it] is reasonably susceptible of more than one interpretation" (*Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]). Only when a contract is found to be ambiguous will a court look to extrinsic evidence to resolve the ambiguity (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). If the contract on its face is

"reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity" (*id.* at 569-570 [citations omitted]).

Here, Macy's and MSLO agree that the Macy's/MSLO agreement is unambiguous. As such, I need not consider any of the parties' testimony regarding their intent and expectations in entering into the Macy's/MSLO agreement. Read as a whole, the provisions of this fully integrated contract between two sophisticated parties are simply not susceptible to multiple, reasonable interpretations.

(i) The Store within a Store Exception

MSLO and JCP's foundational argument that the JCP/MSLO agreement did not violate the terms of the Macy's/MSLO agreement rests on the interpretation of the term "MSLO Store." MSLO and JCP forcefully argue that the Macy's/MSLO agreement provides a carve out from exclusivity for an MSLO Store, and that JCP's creation of MSLO Stores within JCP stores is therefore permissible. In fact, Mr. Taitz gave testimony on the drafting history of the MSLO Store provision, including that there had been an interim draft of the agreement in which "Macy's had inserted as a requirement relative to the store . . . the words 'that is not affiliated with any third party and in which no third party retailer or manufacturer of department store type merchandise may have [an] interest' " and that "those words did not appear in the final agreement" (trial tr at 2524, line 12 through 2524, line 14; at 2527, line 8 through 2528, line 21). Of course, Macy's vigorously challenges this interpretation.

To be sure, the Macy's/MSLO agreement permits MSLO to compete with Macy's in limited circumstances under certain conditions, namely, by way of an MSLO Store (P1 §§ 2 [a], [b]; 4, 18 [b]). The question is whether the "MSLO Store" contemplated in the JCP/MSLO agreement falls within this permissible exception. The parties overlook the obvious in arguing this issue.

An MSLO Store is defined as "any retail store branded with Martha Stewart Marks or Stewart Property that is owned or operated by MSLO or an Affiliate of MSLO or that otherwise prominently features Martha Stewart Marks or Stewart Property." Whether or not the MSLO Store in the JCP/MSLO agreement is a "retail store" is not dispositive. Indeed, contrary to Macy's argument, the MSLO Store contemplated by the JCP/MSLO agreement has all the indicia of a retail store, i.e., four walls, cash registers, store counters, salespersons. Further, al-

though it is not "owned or operated by MSLO or an Affiliate of MSLO," it does "otherwise prominently feature[ ] Martha Stewart Marks or Stewart Property." Ostensibly, under Mr. Taitz's historical account, the MSLO Store contemplated by the JCP/MSLO agreement is permissible under the Macy's/MSLO agreement. Not so fast.

Here, with respect to the operational aspect, MSLO's and JCP's relationship under the JCP/MSLO agreement would operate in essentially an identical manner to the way Macy's and MSLO operated pursuant to their agreement. In that regard, MSLO would collaborate with JCP on the design process, product assortment, packaging and advertising for the licensed goods in exchange for royalties calculated as a percentage of sales, but JCP would manufacture the goods, own the goods, design and construct the display areas, stock the shelves, control the displays, employ the sales personnel, own the sales space, and book the sales and revenues (*compare* P1 at 7-18 *with* P92 at 8-24). Indeed, Mr. Johnson testified as much: MSLO would not own or rent retail space from JCP; JCP, not MSLO, would source the goods; JCP would hire the staff; JCP would own the goods sold in the stores and maintain the inventory; JCP would book the sales as revenue; JCP would price the goods; JCP would decide when products would go on sale; and JCP would bear all risk of loss (trial tr at 1306, line 2 through 1306, line 20).

I find this operational framework for the MSLO Store violates section 18 (b), entitled "Non-Competition by MSLO," of the Macy's/MSLO agreement. Although the Macy's/MSLO agreement contemplates potential competition between MSLO and Macy's by way of an MSLO Store, section 18 (b) is clear and unambiguous—it prohibits MSLO from entering into any agreement "with any department store . . . that promotes the sale of any items . . . within the Exclusive Product Categories that are branded with the Trademark or any Martha Stewart Mark." To find otherwise would permit MSLO to do what section 18 (b) of the Macy's/MSLO agreement clearly and unequivocally prohibits. Thus, under these circumstances, without this foundational basis to enter into the JCP/MSLO agreement, and by entering into that agreement, MSLO breached section 18 (b) of the Macy's/MSLO agreement.

This finding would normally end the inquiry as to whether there was a breach. That is not the case. Given that Macy's argues that the 900 designs that MSLO provided to JCP pursuant to the JCP/MSLO agreement was itself a breach of the Macy's/MSLO agreement, I now address design exclusivity.

(ii) <u>Exclusivity of Designs</u>

To be clear, the evidence clearly demonstrates that the Macy's/MSLO agreement is not and never has been a personal service contract. It is and has always been a licensing agreement providing Macy's with the exclusive right to exploit the Martha Stewart trademark in certain circumstances. Also, there is no dispute that Macy's does not own the designs, but that MSLO always retained ownership of its designs and its intellectual property. Indeed, the Macy's/MSLO agreement provides Macy's with the exclusive right to license and use the Martha Stewart trademark for exclusive products within the exclusive product categories. Exclusive products are defined as products in the exclusive product categories that are Martha Stewart branded.

MSLO and JCP argue that the Macy's/MSLO agreement did not give Macy's the exclusive right to MSLO's designs for products in the exclusive product categories that will not bear any Martha Stewart mark. Contrary to their position, for the reasons that follow, whether or not a product falling within the exclusive product categories bears a Martha Stewart mark is not relevant to the disposition of the issue of design exclusivity. The critical issue is whether Macy's has exclusivity over designs produced by MSLO in the exclusive product categories—before a product is considered for branding or not. This issue is sharply disputed.

Macy's argues that the relevant terms of sections 2 and 4, read together, provide it with exclusivity over all of MSLO's designs for items in the exclusive product categories. Not surprisingly, MSLO, with strong support from JCP, argues otherwise. In that regard, MSLO argues that there is no wording in the agreement that provides that MSLO can only design for Macy's and cannot design for others. In fact, MSLO and JCP argue that the Macy's/MSLO agreement contains no prohibition on MSLO designing for JCP and JCP selling products in the exclusive product categories branded with the "jcp Everyday" mark, or on MSLO designing products that were not developed in collaboration with Macy's "in accordance with the merchandising plan mutually agreed to by" Macy's and MSLO. To be clear, MSLO and JCP correctly point out that those exact words do not exist. For me to accept this argument, however, would require me to ignore the clear contractual provisions set forth in sections 2, 4 and 18.

While not explicitly precluding MSLO's design arrangement with JCP, that arrangement clearly violates section 18 (b)'s non-

compete provisions. Further, MSLO's reliance on its business relationship with Kmart that was coexisting with the Macy's/MSLO agreement is misplaced. The Macy's/MSLO agreement acknowledged the existence of that relationship, and permitted it to continue to its contractual expiration. Reliance on The Home Depot, Avery, EK Success, and a host of other MSLO "partners" is equally misplaced because those arrangements have nothing to do with items in the exclusive product categories. Next, and more importantly, sections 2 and 4 clearly provide Macy's with exclusivity of MSLO's designs in the exclusive product categories. Section 2 (a) (iii) provides that Macy's gets "exclusive use" of "product designs, trade dress and other materials developed by MSLO in connection with its activities under *Section 4.*" Section 4, entitled "Product Development and Design," covers MSLO's activities in the area of the exclusive product categories. That section requires MSLO to establish

> "concepts, designs and product selections in collaboration with [Macy's] (the *'Design Direction'*) for the Exclusive Products and any Branded Non-Exclusive Products to be manufactured by [Macy's] (together, the *'Macy's Manufactured Products'*) and each Party's design personnel shall work in cooperation with each other and with the manufacturing personnel of [Macy's] (including, without limitation, [Macy's] vendors of Exclusive Products) to design and create Macy's Manufactured Products consistent with the Design Direction established by MSLO in collaboration with [Macy's] . . . ."

This collaborative and cooperative structure is critical to implementing section 2 (a) (iii). Both sections are not mutually exclusive and must be read together. Thus, a plain reading of sections 2 (a) (iii) and 4, together, establishes that MSLO is required to provide all designs "developed by MSLO in connection with" the design and conceptual activities of section 4. Further, section 2 (b) (ii) expressly prohibits MSLO from entering into any agreement allowing anyone else to use its product designs in regard to its section 4 activities (i.e., the licensed property) in connection with the manufacture, marketing, distribution, and sale of any items in the exclusive product categories, regardless of branding.

After reading and reviewing these sections collectively, the simple fact is that the Macy's/MSLO agreement provides for exclusivity of items in the exclusive product categories. From

that and through collaborative efforts between Macy's and MSLO, MSLO creates designs for those items. Afterwards, again through collaborative efforts, decisions are made as to what designs will be selected and branded to become an exclusive product. Clearly then, under this process, set forth in the Macy's/MSLO agreement, one would need the design in order to arrive at a product to be branded. Indeed, if this process were not the case, namely, no exclusivity of design for items in the exclusive product categories, then how does one arrive at a product to be branded? Simply put, Macy's needs the MSLO design in order to get to the product to be branded so as to become an exclusive product.

Nonetheless, MSLO argues:

> "Macy's argument that Section 4 should be read to *imply* a sweeping bar on MSLO's design activities for other partners cannot be reconciled with the 28-page Agreement, which is extremely detailed and explicit about what the parties can and cannot do. It is inconceivable that the parties to this carefully drawn contract would agree to something as momentous as a categorical ban on MSLO designing in the Exclusive Product Categories—that is, a provision precluding MSLO from an entire area of potential business growth—and then not explicitly say that, but leave it to *post hoc* inference and implication" (posttrial mem of defendant Martha Stewart Living Omnimedia, Inc. at 13-14).

In making this argument, MSLO apparently suffers a memory lapse with respect to Macy's concerns during the 2005 negotiations, i.e., all the above-noted significant risks that Macy's had to undertake in entering into a relationship with MSLO. Clearly, this restriction was not inconceivable. Moreover, as the parties concede that the Macy's/MSLO agreement is unambiguous, I cannot draw any inference from the absence of such a provision, but must accept the terms as written.

In a last-ditch effort, JCP posits that Macy's and MSLO's pre-dispute course of dealing proves that the parties always understood that MSLO could design products within the "Exclusive Product Categories" for others, under names unrelated to Martha Stewart. As evidence, JCP points to the fact that "since at least 2008, MSLO has designed products in the Exclusive Product Categories for [celebrity chef] Emeril Lagasse under the name 'Emeril' without complaint from Macy's" (JCP posttrial brief at 27). JCP further points out that although

Macy's was aware that the Emeril brand was owned and controlled by MSLO (trial tr at 683, lines 13-18) it never raised any complaints that MSLO was designing those products in violation of the Macy's/MSLO agreement. JCP, thus, reasons that Macy's silence "is plain: Macy's did not complain because 'Emeril' was not sold using a Martha Stewart Mark" (JCP post-trial brief at 28). Following this line of reasoning, JCP would have me rule that because Macy's did not complain about Emeril, which indisputably involved items in the "Exclusive Product Categories," Macy's cannot now complain that products sold by JCP that were only branded with the jcp Everyday logo are prohibited under the Macy's/MSLO agreement.

JCP's argument is unavailing. In taking this position, JCP overlooks the clear "No Waiver of Rights" provision found in section 24 (f) of the Macy's/MSLO agreement, which expressly states that

> "[a] failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege" (P1 at 26).

In short, whether Macy's did or did not object to MSLO designing items for the Emeril brand has no bearing on the instant dispute.

▮ Thus, I find that the Macy's/MSLO agreement provides Macy's with exclusivity over MSLO's designs in the exclusive product categories, and that by entering into the JCP/MSLO agreement MSLO breached its contractual obligation owed to Macy's pursuant to their agreement.

C. Inducement of the Breach

Having determined that there is a breach, the next issue to resolve is whether JCP induced it. The preponderance of trial evidence overwhelmingly establishes that JCP intentionally induced MSLO to enter into their agreement, and that MSLO would not have done so absent JCP's conduct. Specifically, JCP offered Ms. Stewart both flattery and large financial inducements. Mr. Johnson told Ms. Stewart that she was not realizing her potential with Macy's, and that JCP could "take her to a whole new level" (trial tr at 1255, line 19 through 1255, line 22), and "rightfully place Martha where she belongs as the

unquestioned authority for living of our generation" (P17 at 2). JCP told her that no one else could offer what JCP was offering (P141 at 1). And, as soon as MSLO informed JCP that its financial proposals were too low, and that MSLO "would not give up Macy's for relatively little gain" (P162 at 4), JCP immediately improved its offer to get MSLO to do the deal (P166 at 1).

Although the procurement of the breach was intentional, the critical issue is whether Macy's has proved that the breach herein would not have occurred but for JCP's activities (*Cantor Fitzgerald Assoc. v Tradition N. Am.*, 299 AD2d 204 [1st Dept 2002], citing Restatement [Second] of Torts § 766). Section 766 of the Restatement (Second) of Torts defines "intentional procurement" of a breach as requiring proof that there was "certainty" or "substantial certainty" that the JCP/MSLO agreement would cause MSLO to breach the Macy's/MSLO agreement. As such, Macy's must prove that the Macy's/MSLO agreement is so clear and unambiguous that JCP had "certainty" or "substantial certainty" that it was causing MSLO to breach the Macy's/MSLO agreement, notwithstanding MSLO's repeated assurance that the JCP/MSLO agreement would not cause MSLO to breach the Macy's/MSLO agreement. In effect, Macy's must prove proximate cause to prevail on its claim (*Cantor Fitzgerald Assoc.*, 299 AD2d at 204).

To begin, MSLO's merchandising division was strong and successful, and MSLO's impetus for seeking funding was not due to any dissatisfaction with the Macy's/MSLO agreement. Were the facts to be otherwise on this last point, Macy's would be hard-pressed to establish proximate cause (*cf. Cantor Fitzgerald Assoc.*, 299 AD2d at 204). Rather, MSLO's efforts were solely the result of the fact that its media business was losing substantial monies, and MSLO needed to stabilize its finances, which is how JCP came into the picture.

JCP makes much of the fact that it undertook substantial due diligence to ensure that the JCP/MSLO agreement would not be a breach of the Macy's/MSLO agreement. Thus, JCP argues there can be no "certainty" or "substantial certainty" of a breach. Those efforts, however, cannot be viewed in a vacuum. For example, as to the MSLO Store, Ms. Burchett, one of JCP's lead negotiators, was concerned that the MSLO store within a store exception might not hold up after reviewing the "MSLO Stores" provision set forth in the Macy's/MSLO agreement (trial tr at 2324, line 16 through 2324, line 21).

Yet another example of "certainty" or "substantial certainty" is the indemnification provisions set forth in section 16 of the JCP/MSLO agreement. Section 16 (a) provides that JCP will indemnify MSLO against certain claims not relevant to this action (P92 at 29). Section 16 (b), entitled "Indemnification of JCP," of the JCP/MSLO agreement provides, in relevant part:

> "MSLO will indemnify and hold harmless JCP . . . from and against all Claims that arise out of or relate to: (i) any third party claims challenging JCP's use of the Trademarks or the MSLO Content as authorized by this Agreement, including claims that such use violates or infringes any Intellectual Property right of any third party" (P92 at 29).

Thus, as is relevant to this action, section 16 (b) obligates MSLO to indemnify JCP in certain instances where a third-party claim challenges JCP's use of the "Trademarks" or the "MSLO Content" authorized by the JCP/MSLO agreement, including claims that "such use violates or infringes any Intellectual Property right of any third party."

Notably, while section 16 (b) provides for a general indemnification in JCP's favor for third-party claims challenging JCP's use of MSLO's trademarks, section 16 (c), entitled "No Liability," eliminates MSLO's obligation with respect to a "2006 Agreement," which is defined as "that certain MSLO license agreement dated April 3, 2006, including all amendments thereto and extensions and renewals thereof" (P92 at 6). Of course, the only agreement dated April 3, 2006 is the Macy's/MSLO agreement. Thus, while not specifically mentioning the Macy's/MSLO agreement, section 16 (c) unquestionably addresses it. Section 16 (c) provides, in relevant part:

> "Notwithstanding anything to the contrary in this Agreement, including any representation, warranties and covenants, as to any Claims based on the 2006 Agreement, JCP agrees that it will not seek and is not entitled to indemnification for monetary damages or attorneys' fees or otherwise, nor will it seek to cancel or terminate this Agreement due to any such Claims or the resolution or settlement thereof, nor seek any other damages or remedies at law or in equity or other relief against MSLO or any of its Affiliates under this section or otherwise. Also notwithstanding anything to the contrary in this Agreement, JCP further agrees that: (i) such Claims based on the 2006 Agreement will not constitute a

breach of this Agreement; and (ii) JCP will not have a cause of action against MSLO or any of its Affiliates for any breach of a representation, warranty or covenant set forth in this Agreement as such representation, warranty or covenant relates to the 2006 Agreement" (P92 at 30).

When questioned about why MSLO did not want to indemnify JCP, Mr. Taitz testified that while he believed that the "likelihood that someone would later view this as a breach was a very low probability," he thought that "it was a very high probability that Macy's would attack it" (trial tr at 2536, line 2 through 2536, line 6). This explanation is nothing more than circular reasoning. Attacking the JCP/MSLO agreement is exactly how one would determine whether there was a breach. More importantly, section 16 (c) clearly placed JCP on notice that MSLO was not willing to stand by its interpretation of the Macy's/MSLO agreement. Indeed, pursuant to section 16 (c), MSLO unequivocally disclaims any representation or warranty related to the Macy's/MSLO agreement that formed the basis of the JCP/MSLO agreement. With the exception of Mr. Taitz's testimony that I have already noted, and passing reference to the indemnification issue in Mr. Johnson's and Ms. Burchett's testimony, JCP did not proffer any testimony or documentary evidence to the contrary. In fact, during summations, JCP's counsel acknowledged that JCP knew it might be sued (trial tr at 3027). Under these circumstances, I find that the preponderance of the evidence establishes that JCP had "certainty" or "substantial certainty" to know that there would be a breach. The remaining question is whether JCP's conduct was improper.

In response to a claim of improper behavior

"a defendant may raise the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business. The defense has been applied, for example, where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff" (*White Plains Coat & Apron*, 8 NY3d at 426).

Were that a defense, the evidentiary proof clearly establishes that JCP had no legal or financial stake to protect in MSLO's

business when JCP began negotiations with MSLO. Instead, JCP was seeking to create business interests where none had existed.

With regard to improper conduct, the *White Plains Coat & Apron* Court observed the following:

> "protecting existing contractual relationships does not negate a competitor's right to solicit business, where liability is limited to *improper* inducement of a third party to breach its contract. Sending regular advertising and soliciting business in the normal course does not constitute inducement of breach of contract. A competitor's ultimate liability will depend on a showing that the inducement exceeded 'a minimum level of ethical behavior in the marketplace' " (8 NY3d at 427).

I dispense with this issue by relying on the events leading up to the "strategic alliance" and the behavior exhibited afterwards. The uncontested facts underscore how "over the top" Mr. Johnson's and his team's conduct and relentless efforts were in JCP's pursuit of MSLO and Ms. Stewart—conduct and efforts that the JCP board endorsed. Under these circumstances, the preponderance of the evidence compels me to find that JCP's "inducement exceeded a minimum level of ethical behavior in the marketplace," and, as such, was improper.

■ Based on the foregoing, I find that Macy's has established JCP's liability for tortious interference with its contract with MSLO.

## II. Remedies/Damages

### A. Permanent Injunction

Macy's claim for a permanent injunction against MSLO is moot given the fact that it discontinued its action against MSLO. Macy's has also withdrawn its claim for a permanent injunction against JCP because JCP has terminated its business relationship with MSLO in the disputed product categories.

### B. Damages

With respect to lost profit damages relating to the MSLO Stores issue, in July 2012, I enjoined MSLO from allowing JCP to sell goods in the exclusive product categories with a Martha Stewart brand in an MSLO Store located within a JCP store. Given that MSLO and JCP have complied with that directive, Macy's suffered no lost profits on that theory.

As to Macy's other claimed damages, the only one that bears consideration is the dispute over the 900 designs, which MSLO

prepared for JCP pursuant to the JCP/MSLO agreement. At trial, MSLO argued that the trial evidence clearly established that these designs would not have been created at all in the absence of that agreement. Indeed, although there is no dispute that these designs resulted from the collaborative efforts between MSLO and JCP, the question is how much of those designs, if any, was influenced from the knowledge MSLO obtained through its collaborative relationship with Macy's and used in its collaboration with JCP. That is a sharply disputed issue. In that regard, although Gia Sung, MSLO senior designer—tabletop, testified that she was never concerned about overlap or cross-pollination of design ideas for clients (trial tr at 2449, line 5 through 2451, line 10), she also testified that a designer's creativity gets better with experience, i.e., "[y]ou get more savvy as you go along" (id. at 2459, line 14 through 2461, line 17), and that if she did a design for JCP it would not be presented to Macy's (id. at 2470, line 13 through 2470, line 26). Under these circumstances, whether the disputed 900 designs rightfully belong to Macy's pursuant to the Macy's/MSLO agreement is an open issue. That issue will necessarily require discovery concerning the 900 designs to determine what influence, if any, did Macy's collaborative efforts with MSLO have on MSLO's designs for JCP. Resolution of that issue does not end the inquiry. Further complicating the issue is the fact that JCP sold products manufactured pursuant to these designs, and marked them with the "jcp Everyday" Double House logo. The question then is if these designs rightfully belonged to Macy's would Macy's have selected the ones chosen by JCP to be an exclusive product. In other words, by obtaining these designs pursuant to the JCP/MSLO agreement, did JCP deny Macy's the opportunity to consider whether to accept these designs for production and sale. The determination of that issue will impact Macy's claim for lost profits. Macy's shall have the opportunity to proffer evidence of lost opportunity, if any, based on credible and admissible evidence. Speculative damages will not be considered. To the extent JCP realized a profit on such sales, if any, those monies may belong to Macy's. I noted as much when I denied Macy's application during trial for a preliminary injunction against JCP seeking to enjoin it from selling the "jcp Everyday" products:

> "J.C. Penney will pay dearly at the end of the day if [Macy's] prevail[s] in terms of that because I'm still trying this case. I followed it thoroughly and at the

end of the day—and Mr. Epstein made the remark—that if you prevail, Macy's prevails, they're going to have to pay handsomely, probably, in the long run.

"They'll have to argue and try to defend against any damages [Macy's] [may] claim, but at the end of the day, having heard all these arguments and putting out there the risk for everybody, that I might be inclined—I may be inclined to be more open-minded to what damages Macy's may have suffered as a result of me letting [JCP] put the products on.

"So that at the end of the day, however you want to claim irreparable harm, whatever economic interest, a check will be cut to [Macy's] if [Macy's] prevails" (Apr. 12, 2013 trial tr at 106, line 24 through 107, line 15).

Accordingly, this damage issue is respectfully referred to a special referee/judicial hearing officer to hear and report.

C. Attorney's Fees

Macy's also seeks an award of attorney's fees. The American rule provides that legal fees are not recoverable absent a contractual provision or statutory liability (*Coopers & Lybrand v Levitt*, 52 AD2d 493, 496 [1st Dept 1976]). There is, however, a well-recognized exception to this rule. That exception holds that "[i]f, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred" (*id.*). Such attorney's fees and other expenses should be reasonable and the natural and necessary consequences of the defendant's tortious acts (*id.*; *Central Trust Co., Rochester v Goldman*, 70 AD2d 767, 768 [4th Dept 1979]; *Matter of John T.*, 42 AD3d 459, 463 [2d Dept 2007] [tortious conduct proximately causing aggrieved party to incur legal fees]). Further, if Macy's is entitled to an award of legal fees, such an award is limited in scope. As the Court of Appeals explained in *Hunt v Sharp* (85 NY2d 883, 885 [1995]), "[w]hatever the proper scope" of the exception to the general rule, the exception only allows recovery of fees commenced against a third party. Thus, to the extent Macy's is entitled to recover any attorney's fees, it is only entitled to recover the reasonable value of such fees incurred against MSLO. Thus, the remaining question to be resolved is whether JCP's conduct was the proximate cause of the legal fees incurred by Macy's in its action against MSLO.

Contrary to Macy's position, my finding that JCP is liable to Macy's for its tortious interference of contract claim may not amount to a finding of proximate cause that would entitle Macy's to recover attorney's fees from JCP. Indeed, part of the proximate cause analysis may require consideration of the reasons why Macy's exercised its renewal rights and Mr. Johnson's testimony that JCP hoped that the JCP/MSLO agreement would pressure Macy's to walk away from its right of renewal with MSLO, which would have obviated this lawsuit. In other words, a determination will need to be made as to whether Macy's action against MSLO was the natural and necessary consequence of JCP's conduct. Under these circumstances, the issue of whether Macy's is entitled to an award of attorney's fees, and, if so, the amount to be awarded to Macy's, is respectfully referred to a special referee or judicial hearing officer to hear and report.

Of course, double recovery for legal fees and the other damage claim is not permitted. As Macy's acknowledged, "[t]he settlement agreement between Macy's and MSLO is confidential, but to the extent that MSLO may have compensated Macy's in any way for losses that are recoverable against J.C. Penney, we would accept that compensation as an offset against damages by Penney" (plaintiff's supplemental mem at 4).

D. Punitive Damages

I turn now to the final relief Macy's seeks against JCP—an award of punitive damages. Such damages are proper only if JCP's conduct in perpetrating the tortious interference of contract was wanton, reckless, and malicious, and evinced a high degree of immorality. The purpose of punitive damages is not to compensate Macy's, but to punish JCP for its conduct and thereby discourage JCP and other companies from acting in a similar way in the future (*Ross v Louise Wise Servs., Inc.*, 8 NY3d 478, 489 [2007]). Further, Macy's entitlement to punitive damages must be established by "clear, unequivocal and convincing evidence" (*Munoz v Puretz*, 301 AD2d 382, 384-385 [1st Dept 2003]).

An act is malicious when it is done deliberately with knowledge of a plaintiff's rights, and with the intent to interfere with those rights (*Marinaccio v Town of Clarence*, 20 NY3d 506, 511-512 [2013]). An act is wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the rights of others (*Gostkowski v Roman Catholic Church*, 262 NY 320 [1933]). In resolving these difficult issues, I need to consider

the nature and reprehensibility of what JCP did. Such consideration necessarily includes the character of the wrongdoing, whether JCP's conduct demonstrated an indifference to, or a reckless disregard of, the rights of others, whether the acts were done with an improper motive or vindictiveness, whether the acts constituted outrageous or oppressive intentional misconduct, how long the conduct went on, JCP's awareness of what harm the conduct caused or was likely to cause, any concealment or covering up of the wrongdoing, how often JCP had committed similar acts of this type in the past, and the actual and potential harm created by JCP's conduct.

Resolution of this issue is difficult. As the trier of fact, I am the sole judge of the facts, and must weigh and consider the evidence critically to determine these difficult issues—ultimately, I am to decide whether to hold JCP, a major domestic retailer, liable for punitive damages. As the trial evidence amply demonstrated for other issues, a finding of liability on this issue may have unintended and severe collateral economic consequences. This deliberation is not undertaken lightly.

Clearly, the preponderance of the trial evidence demonstrates that the behavior exhibited by JCP's top executives, with JCP board ratification, has been less than admirable. At best, one can only describe such conduct as adolescent hijinks in the worst form. Having said that, does such conduct warrant a finding that it is wanton, reckless, and malicious, and that it evinces a high degree of immorality? Indeed, if I were to limit myself to these undisputed facts, perhaps a finding of liability would be warranted. I cannot, however, do so.

■ I find that the key deciding factor for resolution of this issue is the original motivation for Mr. Johnson and JCP's grand strategy—to gain an edge in the ever-increasing competitive retail market and to revolutionize the way consumers shop for merchandise. Not only was that the original motivation, the trial evidence establishes that it was the only motivation. Mr. Johnson's testimony is clear:

> "Q Your reason to have Martha Stewart was to attract people who were customers at Macy's along with other stores, right?
>
> "A Along with other stores, correct" (trial tr at 1264, line 4 through 1264, line 7).

Messrs. Lawrence and Francis, the other JCP executives, gave similar testimony (*id.* at 516, line 11 through 522, line 26; at 708, line 8 through 712, line 14; at 721, line 6 through 729, line

22). Thus, the adolescent hijinks amount to nothing more than distractions, gamesmanship, and one-upmanship. If one were to say that a finding of no liability for punitive damages would be to condone such corporate behavior and let JCP get off easy, consider the following facts. Mr. Lundgren and Macy's, the loyal and unsuspecting partners, have been vindicated. JCP terminated Mr. Johnson on April 8, 2013, before this trial ended, a casualty of his own hubris. JCP, its board of directors, and its top executives were publicly ridiculed and humiliated as a consequence of this trial. Their grand strategy was a colossal and abject retail failure. The termination of JCP's "strategic alliance" with MSLO and Ms. Stewart underscored how ill-conceived it was, to the point where it placed JCP on the verge of financial collapse. I find that these significant facts are a sufficient deterrent to JCP and other companies from acting in a similar way in the future. Based on the foregoing, I find that Macy's failed to prove by "clear, unequivocal and convincing evidence" that it is entitled to a punitive damage award against JCP.

Accordingly, it is ordered and adjudged that defendant, J.C. Penney, tortiously interfered with plaintiffs', Macy's, Inc. and Macy's Merchandising Group, Inc., agreement with defendant, Martha Stewart Living Omnimedia, Inc.; and it is further ordered that the issues of damages and attorney's fees are respectfully referred to a judicial hearing officer or special referee to hear and report on those issues.