[6 NYS3d 7]

MACY'S INC. et al., Respondents-Appellants, v MARTHA STEWART LIVING OMNIMEDIA, INC., Defendant, and J.C. PENNEY CORPORATION, INC., Appellant-Respondent.

First Department, February 26, 2015

## APPEARANCES OF COUNSEL

*Munger, Tolles & Olson LLP*, Los Angeles, CA (*Mark H. Epstein* of the bar of the State of California, admitted pro hac vice, of counsel), and *Miller & Wrubel P.C.*, New York City (*Martin D. Edel* and *Adam J. Safer* of counsel), for appellant-respondent.

*Jones Day*, New York City (*Theodore M. Grossman* and *Michael A. Platt* of counsel), for respondents-appellants.

## OPINION OF THE COURT

SWEENY, J.

The case before us involves two contracts and three well-known corporate entities. The first contract is between plaintiffs, Macy's, Inc. and Macy's Merchandising Group (collectively, Macy's), and former defendant Martha Stewart Living Omnimedia, Inc. (MSLO). The second contract is between MSLO and defendant J.C. Penney Corporation, Inc. (JCP).

Macy's complaint against JCP alleges tortious interference with contract and unfair competition, and asserts a demand for an award of punitive damages, all stemming from allegations of unethical and improper conduct by JCP in causing MSLO to breach its contract with Macy's.* More specifically, Macy's alleges, in two separate causes of action, that JCP's actions caused MSLO to breach the exclusivity (first cause of action) and confidentiality (second cause of action) provisions of its contract with Macy's. Macy's also alleges in its third cause of action that JCP's actions constituted unfair competition. Finally, Macy's seeks punitive damages against JCP.

After a bench trial, the court found that JCP tortiously interfered with Macy's and MSLO's contract regarding the exclusivity provision of the agreement (45 Misc 3d 274 [2014]). JCP has appealed that determination. The court granted JCP's motion for judgment as a matter of law dismissing Macy's remaining causes of action, and denied Macy's application for punitive damages. Macy's has appealed that ruling.

The record reveals the following pertinent facts: In 2006, Macy's and MSLO entered into a licensing agreement granting Macy's certain exclusive rights with respect to products designed by MSLO. These products were defined in the agree-

---

* After a bench trial but before the court rendered its final decision, Macy's settled its case against MSLO, leaving only the claims against JCP before us.

ment as "Exclusive Product Categories" and included bedding, bathware, housewares and cookware. In conjunction with Macy's, MSLO would design goods in those categories, which were branded with the MSLO mark. Macy's would manufacture the goods and sell them in Macy's stores. The agreement further provided that Macy's would be the exclusive outlet for sales of these items and that MSLO would not, without Macy's consent, enter into any new agreement or extend any existing agreement "with any department store or manufacturer or other retailer of department store merchandise that promotes the sale of any items" in Macy's Exclusive Product Categories that are branded with a Martha Stewart mark. The agreement further provided that if MSLO ultimately contracted, with Macy's approval, tacit or otherwise, to sell goods in the Exclusive Product Categories through other outlets, such goods were to be manufactured solely by Macy's and could not be sold through a downscale retailer. The agreement was subject to several limitations, the key one being MSLO's reservation of the right to open its own retail stores. These stores were defined as "retail store[s] branded with Martha Stewart Marks or Stewart Property that [are] owned or operated by MSLO or an Affiliate of MSLO or that otherwise prominently feature Martha Stewart Marks or Stewart Property." Even with respect to those MSLO stores, however, only Macy's could manufacture and sell products in its Exclusive Product Categories at Macy's cost plus 20%. This arrangement was designed to prevent MSLO stores from undercutting Macy's prices on those goods. The contract had a five-year term, with Macy's having a unilateral right to renew for a maximum of three subsequent five-year terms. The initial contract was set to expire in 2013 and Macy's timely notified MSLO of its intent to renew in 2012.

In 2011, MSLO needed to raise additional capital. It turned to investment banker Blackstone to find a strategic partner. Blackstone, through its connections with members of the board of directors of JCP, arranged for Ms. Stewart and JCP executives to meet. Although JCP executives admittedly knew of Macy's agreement with MSLO and that MSLO was looking for a strategic (financial) partner, they proceeded to commence negotiations for a retail partnership instead of the strategic partnership initially sought by MSLO. The evidence in the record clearly shows that JCP executives knew that, in order to obtain this retail partnership, they would have to "break" the exclusivity provisions in the Macy's contract. In order to evade

those provisions, JCP viewed the exemption for MSLO stores as a means to attain its goals of creating a retail partnership with MSLO. It proposed creating a "store-within-a-store." Under this concept, MSLO retail stores would be set up as a separate "store" within already established JCP stores. Entry to the store would be located wholly within the confines of JCP stores, i.e., it would not be a freestanding store with a separate outside entrance; the MSLO store would only be accessible by entering through the JCP store. MSLO would help design the branded goods and receive a royalty, just as with Macy's. However, JCP would manufacture the goods, own the inventory, own the retail space, employ the salespeople, book the sales, set the prices, set the promotions and bear all risk of loss.

JCP also insisted, as a condition of entering into the retail agreement, that MSLO provide it, not only with complete copies of the contract with Macy's (which JCP alleged it needed for the Securities and Exchange Commission filings required if it provided a strategic partnership) but also the confidential information regarding Macy's royalty arrangement, product manufacturing and distribution information, and other material which JCP admitted at trial was highly confidential and essentially constituted trade secrets.

JCP had previously asked Blackstone to provide this information but it declined, citing the confidentiality provisions of the Macy's contract. MSLO initially declined several times to provide this information on the same grounds. However, JCP was insistent on obtaining this information, making it a sine qua non of entering into a retail agreement with MSLO. After repeated requests, MSLO ultimately yielded to JCP's requests and did provide this confidential information. Thereafter the parties entered into the arrangement as proposed by JCP, despite misgivings from some executives from both companies as to whether the "store-within-a-store" concept would survive a legal challenge by Macy's should it decide to litigate the agreement as a breach of its contract with MSLO.

■ Macy's first asserts a tortious interference with contract claim against JCP, alleging that JCP induced MSLO to breach the exclusivity provisions of its contract by entering into a licensing agreement with MSLO in 2011 pursuant to which MSLO designed approximately 900 products, branded with MSLO marks, intended to be sold in "MSLO stores" located within JCP stores as described above. The court found that

since JCP would manufacture the goods, own the inventory and, in short, control all aspects of the "store," this would run afoul of the clear language of the contract with MSLO and Macy's that requires Macy's to manufacture all MSLO goods in Exclusive Product Categories, even for MSLO stores. It also violated the prohibition on MSLO from entering into any agreement with any department store that promotes the design and sale of items within the Exclusive Product Categories, thus breaching, among other things, the exclusivity provisions of its contract with Macy's. The court also found that JCP's "relentless efforts" to pursue MSLO and Ms. Stewart were "over the top" and had "exceeded [the] minimum level of ethical behavior in the marketplace," and that by its conduct, it had wrongfully induced MSLO to breach its contract with Macy's (45 Misc 3d at 309). We agree.

It is well settled "that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties" (*Cole v Macklowe*, 99 AD3d 595, 596 [1st Dept 2012]). "[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations" (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 400 [1977] [internal quotation marks omitted; second alteration in original]). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning" (*Greenfield v Philles Records*, 98 NY2d 562, 570 [2002]; *see Telerep, LLC v U.S. Intl. Media, LLC*, 74 AD3d 401, 402 [1st Dept 2010]). In examining a contract to find the parties' intent as to a particular section, a court should read "the entirety of the agreement in the context of the parties' relationship" rather than isolating distinct provisions out of an entire agreement (*Matter of Riconda*, 90 NY2d 733, 738 [1997]). Thus, "[t]he rules of construction of contracts require [the court] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect" (*Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]). A court should "not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning" (*see Tikotzky v City of New York*, 286 AD2d 493, 494 [2d Dept 2001]).

To sustain its claim of tortious interference with contract, Macy's must prove (1) that it had a valid contract with MSLO;

(2) that JCP had knowledge of Macy's contract with MSLO; (3) that JCP intentionally induced MSLO to breach its contract with Macy's; (4) that MSLO breached its contract with Macy's; (5) that MSLO would not have breached its contract with Macy's absent JCP's conduct; and (6) that Macy's sustained damages (*White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 NY3d 422, 426 [2007]).

■ There is no question that Macy's contract with MSLO was valid and that the parties were performing pursuant to its terms. There is also no question that JCP knew the contract was valid and binding on MSLO. In fact, in order to achieve its goal of obtaining MSLO products and designs for its own stores, the record is replete with references from JCP personnel that they had to find a way to "break" that "tight" contract. The agreement between Macy's and MSLO is not ambiguous, and thus, the extrinsic evidence regarding the parties' intent and expectations in entering into the agreement need not be considered. Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous (*Innophos, Inc. v Rhodia, S.A.*, 38 AD3d 368, 369 [1st Dept 2007], *affd* 10 NY3d 25 [2008]). On the record before us, the evidence establishes that JCP had, as the court found, a "certainty" or "substantial certainty" that its actions would result in a breach, particularly in light of the unambiguous language of the contract requirement that all MSLO goods in the Exclusive Product Categories, including all such goods sold in any MSLO store, had to be manufactured by Macy's. There are no exceptions to this exclusivity of manufacture, yet JCP's agreement with MSLO called for JCP to manufacture these products. Further, there is evidence that, but for JCP's activities, MSLO would not have breached its contract with Macy's. Indeed, even after breaching the terms of its contract with Macy's by entering into the contract with JCP and providing JCP with highly confidential information, MSLO continued to design products for and otherwise perform under its contract with Macy's. Thus, the court properly found for Macy's on this cause of action.

■ The second cause of action, alleging tortious interference with contract by JCP, should not have been dismissed. Macy's alleges that JCP induced MSLO to disclose the terms of its agreement and confidential financial information. This was a violation of the confidentiality provision of the agreement. Macy's sufficiently demonstrated that the material disclosed does

not fall under any exception to the confidentiality provisions as required by law or legal processes. Further, Macy's demonstrated that the scope of disclosure was not properly limited with respect to the information provided and the personnel receiving it. As noted, JCP sought this information almost from the inception of its discussion with MSLO. The information was tantamount to trade secrets, as JCP's executives acknowledged. The evidence on this record clearly showed that JCP intended to, and did in fact, use its financial leverage over MSLO to obtain this information. It used this leverage by making its licensing proposal with MSLO contingent on MSLO's providing the entire Macy's agreement, including the material covered by the confidentiality provisions. By providing the material at JCP's insistence, MSLO breached its contract with Macy's. Moreover, despite its agreement with MSLO regarding limiting the disclosure of this confidential material to certain personnel, JCP shared this information with members of its negotiating team working on the licensing agreement, who in turn shared it with other JCP executives and personnel. It was JCP's inducement of MSLO's breach of the confidentiality provisions in Macy's contract that ultimately brought about the finalization of its agreement with MSLO.

The court also erroneously dismissed Macy's unfair competition claim. It is well settled that "the primary concern in unfair competition is the protection of a business from another's misappropriation of the business' 'organization [or its] expenditure of labor, skill, and money' " (*Ruder & Finn v Seaboard Sur. Co.*, 52 NY2d 663, 671 [1981], quoting *International News Service v Associated Press*, 248 US 215, 239 [1918]). Indeed, "the principle of misappropriation of another's commercial advantage [is] a cornerstone of the tort" (52 NY2d at 671). Allegations of a "bad faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information" can give rise to a cause of action for unfair competition (*Out of Box Promotions, LLC v Koschitzki*, 55 AD3d 575, 578 [2d Dept 2008] [internal quotation marks omitted]; *see also Beverage Mktg. USA, Inc. v South Beach Beverage Co., Inc.*, 20 AD3d 439, 440 [2d Dept 2005]).

Here, the agreement between Macy's and MSLO provided Macy's with valuable exclusive rights to the Martha Stewart trademark and MSLO's designs in the Exclusive Product Categories, which, as the court found, gave Macy's a competitive advantage. It is conceded that the MSLO brand had significant

value in the retail world, and the record shows JCP was fully aware of Macy's commercial advantage as the exclusive distributor of these branded products. JCP's actions in attempting to misappropriate this commercial advantage by inducing MSLO to breach its agreement falls squarely within *Ruder & Finn*'s definition of unfair competition (*Ruder & Finn*, 52 NY2d at 671). Further, JCP misappropriated Macy's expenditures and labors in obtaining, developing and selling approximately 900 of MSLO's designs in the Exclusive Product Categories to which Macy's was exclusively entitled. Its conduct in this regard, as the trial court found in connection with its discussion on the issue of tortious interference of contract, "exceeded the minimum level of ethical behavior in the marketplace." In using MSLO's designers to develop its designs and products at the same time those designers were developing designs and products for Macy's, and by using Macy's confidential competitive information obtained from MSLO as discussed above, JCP misappropriated Macy's "labor, skill, expenditures, [and] good will," all the while demonstrating bad faith in pursuing its objective (*Parekh v Cain*, 96 AD3d 812, 816 [2d Dept 2012]). Macy's therefore made out a viable claim for unfair competition (*id.*; *Out of Box Promotions*, 55 AD3d at 578).

■ Finally, we agree that Macy's should not be awarded punitive damages. In order to be entitled to punitive damages, a private litigant "must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally" (*Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 613 [1994]). Punitive damages are "a social exemplary remedy, not a private compensatory remedy" (*Garrity v Lyle Stuart, Inc.*, 40 NY2d 354, 358 [1976] [internal quotation marks omitted]).

Macy's, in support of its application for punitive damages, points to, among other things, various emails from JCP's executives and board members which evince a certain degree of malicious gloating over the supposed coup of obtaining MSLO products for their company and the angst it would cause for Macy's executives. Macy's argues that, in conjunction with the actions taken by those executives toward achieving that goal, these emails establish the wanton and reckless conduct required to meet the high threshold for the imposition of punitive damages. To be sure, the conduct of JCP's personnel in this case was intentional and clearly below any minimum stan-

dard of business practices and ethical behavior. However, those emails, while distasteful and far beneath what one would expect from executives of a major corporation, are simply part and parcel of the unsavory atmosphere surrounding JCP's conduct.

Nevertheless, at least with respect to the "store-within-a-store" concept, JCP was given an arguable basis on which to proceed with its negotiations for a retail agreement with MSLO. It bears noting that this concept came from MSLO's counsel, who opined that these stores would be in compliance with the Macy's agreement. JCP had experience with this concept with its Sephora product lines, albeit under very different circumstances. Its personnel were asked to validate whether the concept could work for MSLO. Despite some misgivings by some people involved on both sides of the negotiations as to whether the concept would hold up under a court challenge, the decision to go ahead, while ill-advised, did not constitute the type of wanton and reckless conduct that warrants the imposition of punitive damages.

Taken as a whole, JCP's conduct, while clearly intentional, did not "evince[ ] [the] high degree of moral turpitude and demonstrate[ ] such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v Sheldon*, 10 NY2d 401, 405 [1961]; *Ross v Louise Wise Servs., Inc.*, 8 NY3d 478, 489 [2007]). As a result, the court correctly determined that punitive damages are not warranted in this case.

Macy's raises no arguments in support of its appeal from the order denying its motion to reopen its case-in-chief.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered June 30, 2014, to the extent appealed from, adjudging defendant JCP liable on plaintiffs' first cause of action against it for tortious interference with contract, and denying plaintiffs' request for punitive damages, and bringing up for review orders of the same court and Justice, entered April 15, 2013, and May 16, 2013, which, respectively, granted JCP's CPLR 4401 motion for judgment as a matter of law dismissing plaintiffs' second and third causes of action asserted against JCP, and denied Macy's motion to reopen its case-in-chief, should be modified, on the law, to deny JCP's CPLR 4401 motion, and reinstate the second and third causes of action against it, and otherwise affirmed, without costs. The appeals from the aforesaid orders should be dismissed, without costs, as

subsumed in the appeal from the aforesaid order and judgment.

MAZZARELLI, J.P., SWEENY, ANDRIAS, MOSKOWITZ and RICHTER, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County (Jeffrey K. Oing, J.), entered June 30, 2014, bringing up for review orders, same court and Justice, entered April 15, 2013, and May 16, 2013, modified, on the law, to deny defendant J.C. Penney Corporation, Inc.'s CPLR 4401 motion, and reinstate the second and third causes of action against it, and otherwise affirmed, without costs. Appeal from the aforesaid orders, dismissed, without costs, as subsumed in the appeal from the aforesaid order and judgment.

Motion to enlarge the record on appeal denied.