Extended CHHA Acquisition, LLC v Mahoney (2023 NY Slip Op 01762)

Extended CHHA Acquisition, LLC v Mahoney

2023 NY Slip Op 01762

Decided on April 04, 2023

Appellate Division, First Department

OING, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: April 04, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Jeffrey K. Oing Saliann Scarpulla Bahaati E. Pitt-Burke John R. Higgitt

Index No. 652755/21 Appeal No. 17095 Case No. 2021-04485 

[*1]Extended CHHA Acquisition, LLC, Respondent,
v
Lenore Mahoney et al., Appellants.

Defendants appeal from an order of the Supreme Court, New York County (Andrew Borrok, J.), entered December 3, 2021, which, insofar as appealed from as limited by the briefs, granted plaintiff's motion for summary judgment on the first cause of action for specific performance, and directed defendants to immediately deliver the closing deliverables, including the IT server, and to deposit certain amounts of the purchase price into escrow, and denied defendants' motion to dismiss the specific performance claim.

Wollmuth Maher & Deutsch LLP, New York (David H. Wollmuth, William A. Maher, Michael C. Ledley and Maxwell G. Dillan of counsel), for appellants.
Gutnicki LLP, Skokie, IL (John E. Zummo and Aharon S. Kaye, of the bar of the State of Illinois, admitted pro hac vice, of counsel), and Leader & Berkon, LLP, New York (Michael J. Tiffany of counsel), for respondent.

OING, J. 

This dispute arises out of a failed sale of a home healthcare agency. The seller accuses the buyer of repudiating the contract; the buyer charges that seller thwarted its efforts to close the deal because of seller's remorse. At stake: who owns the business. If the seller prevails, it retains the termination fee; if the buyer prevails, the contractual remedy of specific performance compels the seller to close and sell the company to the buyer.
Defendant Extended Nursing Personnel CHHA, LLC (the seller) is a special needs certified home health agency. The seller is one of only nine special needs home health agencies in the State of New York and one of only six authorized to operate in the City of New York. Defendants Lenore Mahoney, Claudia Taglich, and Vincent Achilarre owned the seller during the relevant time period. Mahoney and Taglich are sisters and inherited their ownership interests in the seller from their mother in 1999. They ultimately bought out the other owners, and each of them owns 46% of the seller. Achilarre, who served as Chief Executive Officer, owns the remaining 8% interest. Plaintiff Extended CHHA Acquisition, LLC (the buyer) is a limited liability company. The buyer's owners, Jeffrey and Agnes Shemia, formed it for the purpose of purchasing Extended Nursing.
The parties entered into the Membership Interest Purchase Agreement, dated September 25, 2019, wherein the seller agreed to sell its interest in Extended Nursing to the buyer for $49 million. The Purchase Agreement required the buyer to make an initial escrow deposit of $1.47 million, which amount would be retained as a termination fee by the seller in the event that the buyer did not close. One of the critical components of the purchase, for which the seller specifically negotiated, was that closing should occur at the earliest practicable time. The Purchase Agreement provides that closing had to happen (i) in the month following the date in which the New York State Department of Health (DOH) approval was secured and the other closing conditions were satisfied, but (ii) in all events, [*2]prior to an "outside date," as set forth in the Purchase Agreement, after which the buyer and the seller had the right to terminate the Purchase Agreement if a closing had not occurred. The outside date was March 25, 2021 — 18 months after the date the parties executed the Purchase Agreement. The seller claims that the outside date was an essential term because it was unwilling to hold the deal open indefinitely at the negotiated purchase price, both because the value of the company could change over time and because a prolonged period of uncertainty would be harmful to the business. The seller avers that it chose 18 months because that time period would have provided the buyer ample time to obtain, among other things, financing and DOH approval. Further, given the uniqueness of Extended Nursing, § 14.17 of the Purchase Agreement provides the buyer with the remedy of specific performance, which, under Purchase Agreement § 12.2(c), survives termination of the Purchase Agreement.
The buyer immediately breached the Purchase Agreement by failing to timely deposit the termination fee, which resulted in the automatic termination of the Purchase Agreement. The seller, however, agreed to amend and reinstate the Purchase Agreement and extend the termination fee deposit deadline by way of the first amendment to the Purchase Agreement, dated October 11, 2019, which the buyer satisfied.
The buyer next encountered two issues that prevented closing for over a year: obtaining DOH approval and financing, which resulted in a second amendment to the Purchase Agreement, the terms of which are not relevant to this appeal. The seller claims that it provided extensive aid to the buyer concerning both issues in a good-faith effort to close, including assisting with the DOH approval process, and leveraging expertise and relationships in the finance industry to help the buyer's principals, Agnes and Jeffrey Shemia, obtain financing. The buyer received a DOH conditional approval on October 14, 2020, which required the buyer to secure financing by December 14, 2020. Accordingly, the parties selected a closing date of December 31, 2020. However, the buyer was unable to close on December 31, 2020 because it had still not secured financing. It again failed to close on February 26, 2021, a date set pursuant to a closing notice sent by the seller, as well as on two subsequent closing dates selected by the buyer — March 1 and March 19, 2021. After four failed closings on the buyer's part, the seller claims it became concerned with the buyer's ability to obtain financing and its repeated failure to meet its obligations to close, even though two of the dates were chosen by the buyer, all of which raised doubts in the seller's mind as to the buyer's willingness and ability to close.
In the meantime, sometime in March 2021, Mahoney, Taglich and Achilarre learned that the seller would receive approximately $9 million in additional revenue in the first week of April 2021 because of [*3]a Medicaid minimum wage adjustment for the period of 2018 through 2020 (rebasing payment). On March 12, 2021, the seller notified the buyer of this rebasing payment, that the seller was entitled to this payment under the Purchase Agreement by way of an increase to the purchase price, and that it would help the buyer address any funding issues resulting from this increase to the purchase price. The buyer initially disagreed, but allegedly later agreed to pay the rebasing payment on the condition that the seller would cover any resulting tax liability. The parties attempted to memorialize their understanding in another amendment to the Purchase Agreement, the proposed fourth amendment, which was never executed.
On March 22, 2021, given the seller's doubts and concerns about the buyer's ability to close, the seller sent a termination notice to the buyer, pursuant to the closing terms of the Purchase Agreement, even though the March 25 outside date was three days away. The parties, however, engaged in further discussions to consummate the transaction, which included the rebasing payment issue. On March 23, 2021, the buyer specifically requested March 29 as the new closing date, which was four days after the March 25 outside date set forth in the Purchase Agreement. The seller agreed to extend the outside date to March 29, and the parties executed a third amendment to the Purchase Agreement, dated March 25, 2021, to reflect the extension. The seller then issued a letter dated March 25 conditionally rescinding its March 22 termination notice on the condition that closing occur on or before 5:00 p.m. on March 29 (initial rescission notice).
On Thursday, March 25, 2021, after the parties had just executed the third amendment, the buyer requested from the seller another extension of the closing date by one day to Tuesday, March 30, purportedly because Monday, March 29, was the second day of Passover. Michael Taglich, Claudia Taglich's husband and an advisor to the seller, then emailed the seller's principals concerning Jeffrey Shemia's request to close on Tuesday:
March 25, 2o21 at 11:10 a.m.:
"Complaining about Monday being a Jewish holiday.
I told him to close Friday or hire a Goyem attorney for Monday.
He is getting back to me.
Advice from my Jewish brothers?
Barry Freeman responds:
That's bull****."
The seller insisted on adhering to the March 29 deadline, and continued to prepare for the Monday closing.
On Friday, March 26 at 2:53 p.m., the seller delivered to the buyer the proposed fourth amendment which memorialized the buyer's agreement to remit to the seller the rebasing payment within three days of receipt, as the parties previously discussed. The seller demanded that the buyer execute the proposed fourth amendment by 5 p.m. In the meantime, while tensions were escalating, at 3:58 p.m., Achilarre emailed the Shemias and Max Lafer, who was the buyer's transaction counsel, a revised rescission notice providing that rescission of the termination [*4]notice would be conditioned "upon Buyer submitting proof to Seller that the required wire transfers were initiated on or before 5:00 p.m. ET on March 29, 2021. If the initiation of the required wire transfers does not occur on or before 5:00 p.m. ET on March 29, 2021, such recission shall automatically be void and of no force of effect, and all claims under the Closing Notices and the Termination Notice shall continue with no further action required by the Seller[]" (revised rescission notice). The seller provided this revised rescission condition at the buyer's request. Thus, the rescission of the seller's termination notice would be effective simply by the buyer wiring the $49 million purchase price. At 4:13 p.m., the buyer, through Agnes Shemia, informed Vincent Achilarre, "I just got wind of the fact the [sic] Mike Taglich does not want to honor our request to close on Tuesday instead of Monday because it is a Jewish holiday. We will not close on Monday." At 4:16 p.m., Achilarre replied to Agnes Shemia, "[j]ust want to make sure you are all agreed on this [to not close on Monday]. Please confirm."
The buyer confirmed that it was not closing on Monday before the end of the day on Friday: (i) by Agnes Shemia, who responded to Achilarre's email at 4:18 p.m. without retracting her refusal to close on Monday; (ii) during a subsequent phone call between Achilarre and Lafer in which Lafer confirmed that the buyer and the Shemias were not closing under any circumstances and calling off the deal; (iii) by Agnes Shemia again, who responded at 4:54 p.m. "I will not give in!" to another email from Achilarre informing the buyer: "Thank you for officially notifying us; deal is off the table. I am pulling everything back in house. Do not even think of ever calling us again regarding this transaction — we are finished with [the buyer]"; and (iv) by Jeffrey Shemia, who texted Michael Taglich after 4:52 p.m., "Keep your company[,] I'm not going to close then."
At 5:23 p.m., Achilarre emailed two staff members at Extended Nursing stating, "the transaction with [the buyer] is not going to close on Monday and we are pulling out of the deal. The Extended Family remains as one with business as usual. You will both report to me from this point forward." Achilarre also cancelled the transfer of the IT server and took other steps necessary to ensure that Extended Nursing could continue to honor its responsibilities under the seller's continued ownership. That evening, the seller's principals and Michael Taglich had the following text exchange:
Michael Taglich, 6:27 p.m.: ". . . WE WONT [sic] COMMUNICATE WITH THE SHEMIAS AS ITS [sic] PASSOVER."
. . .
Vincent Achilarre, 9:30 p.m.: "have to forget this and regroup. We will create more value and in the long run they have done us a favor. Plus we have a nice $9 million windfall to work with. Better things ahead."
(emphasis added).
The record demonstrates that over the weekend of March 27 and 28 the principals of the [*5]buyer and the seller engaged in an epic quarrel over the one-day extension and the rebasing payment, with each side accusing the other of bad faith. Nonetheless, the buyer, through its principal Jeffrey Shemia, informed the seller that the buyer still wanted to close on Monday. The following text exchange occurred amongst the seller's principals and Michael Taglich over that weekend:
Saturday, March 27, 2021:
Michael Taglich, 8:18 a.m.: "I think they had the money. They are dysfunctional, not professional and not very smart. Actually really stupid. . . . At 3pm, yesterday, Max is asking Vince for more details on the working capital schedule. . . . I am happy we are done with them. Let's grow the business and . . . let the dividends keep rolling."
Lenore Mahoney, 8:20 a.m.: "Yeess!!"
Michael Taglich, 1:22 p.m.: "Jeff Shemia just called. I did not pick up the call."
Claudia Taglich, 1:22 p.m.: "Good! Did he leave a vm?"
. . .
Lenore Mahoney, 1:40 p.m.: "Don't answer!!!!! . . . Run!!!"
Claudia Taglich, 1:43 p.m.: "Maybe we should find out what he wants? Maybe he is willing to close on Monday?"
Michael Taglich, 1:44 p.m.: "We can't close on Monday."
Claudia Taglich, 1:44 p.m.: "Why? . . . The Server?"
Michael Taglich, 1:44 p.m.: "Yes."
Lenore Mahoney, 1:48 p.m.: "Don't call back whatever you do!!"
. . .
Michael Taglich, 3:03 p.m., [to Achilarre's wife]: "Suzanne, you would be doing him a favor. By the way, Jeff [Shemia] called me 3x. I'm ignoring him."
Later that afternoon at 3:24 p.m., Lafer, the buyer's transaction counsel, emailed Michael Taglich and Achilarre with revisions to the proposed fourth amendment, along with an initial draft of a funds flow memorandum, as if there was no controversy between the buyer's and the seller's principals. The seller's principals discussed the email shortly after it was sent:
Michael Taglich, 3:59 p.m.: "They just sent us a draft of the 4th amendment."
. . .
Lenore Mahoney, 4:03 p.m.: "Run!! Michael just say no!!"
Michael Taglich, 4:03 p.m.: "I am not responding."
. . .
Michael Taglich, 5:14 p.m.: "Anyway, Vince thinks we can grow Ebitda pretty rapidly[,] so it makes the decision my ego wants to make, easy."
On Sunday March 28, 2021, there were continued texts about the buyer:
Michael Taglich, 2:42 p.m. "Jeff Shemia just called me from an unmarked number. I told him I [don't] . . . do business on Sunday and slammed him."
Claudia Taglich, 2:45 p.m.: "Yay!"
. . .
Vincent Achilarre, 2:47 p.m.: "I have ignored [Jeff Shemia's] calls and Max [Lafer's] calls as well. We will talk tomorrow morning on responding when the nonsense starts again."
Also on March 28, 2021 at 3:08 pm, Jeffrey Shemia sent an email to Achilarre and Michael Taglich asking them to engage with him. Shemia asked:
"Do you want to close this deal or not? I called you Mike on an alternate cell . . . and [you] abruptly hung up Ok, no problem.
Saturday you also failed to pick up. . . ."
Just two minutes later at 3:10 p.m., Jeffrey [*6]Shemia emailed the same recipients stating "lets close Monday please as discussed last week."
On Monday, March 29 at 11:49 a.m., Achilarre emailed Michael Taglich, among others, acknowledging that the buyer still had until 5 p.m. to wire closing proceeds pursuant to the revised rescission notice, but "we do not expect that to happen" because the closing documents were not signed, the closing sum was uncalculated as a result, and the seller had not delivered the server. Then at 11:51 a.m., Michael Taglich emailed the Shemias stating that the seller did not agree with the buyer's revisions to the proposed fourth amendment, but would agree to close without delivering the server contemporaneously if the buyer wired $58 million "today" — the base purchase price agreed under the Purchase Agreement, plus the $9 million rebasing payment — and without further discussion or negotiation. The seller was now demanding the rebasing payment up front at closing because the parties had not executed the proposed fourth amendment, which provided for remittal post closing. Jeffrey Shemia responded to the email at 1:21 p.m. stating that the "money is locked and loaded to go . . . &commat; 49/50mm approx," requested that the server be delivered the following day, advised that the "re-basing check will come . . . when we get it after close," and stated, "[l]et's STOP ! changing the DEAL." Jeffrey Shemia emailed Michael Taglich again at 1:42 p.m., stating that "the ball is in your court to close this deal . . . We agreed to close on the terms we all discussed late Friday afternoon on TPL, SERVER, Caid [sic] Rebasing check." At 12:21 p.m., the seller's financial advisor, Barry Freeman, emailed Michael Taglich and Achilarre, among others, to advise them that the Shemias were "ready to close." Michael Taglich responded at 2:37 p.m., stating that, "[w]e are done with the Shemia Circus . . . Bad faith actions from bad actors."
The buyer ultimately refused to pay the additional $9 million at closing that the seller demanded on March 29, and expressed no interest in negotiating a revised deal that would incorporate the rebasing payment at closing. Although having the funds to close at the price set forth in the Purchase Agreement, the buyer did not wire any funds on March 29 by the 5 p.m. deadline, which would have validated and made effective the revised rescission notice. As a consequence, the revised rescission notice was null and void, thereby reviving the seller's March 22 termination of the Purchase Agreement, valid and effective as of that date. After the wire transfer deadline had passed, the seller's principals expressed relief:
Monday, March 29, 2021:
Lenore Mahoney, 11:53 a.m., [to Michael Taglich]: "Please don't send that last question about wiring funds and Closing" [concerned the buyer might wire funds].
. . .
Michael Taglich, 4:47 p.m.: "Ok gang, I believe we have passed all wire cutoffs." . . .
Claudia Taglich, 4:48 p.m.: "Phew!"
. . .
Vincent Achilarre, 5:21 p[*7].m.: "No wires received . . . [w]e are done — [Purchase Agreement] has expired . . . Moving on to building more value and new business lines."
Michael Taglich, 5:21 p.m.: "Awesome"
Claudia Taglich, 5:30 p.m.: "We're free!"
Lenore Mahoney, 5:30 p.m.: "Great!!!!"
. . .
Lenore Mahoney, 6:05 p.m. [responding to Taglich text to the buyer's investment banker that they missed the closing date]: "Haha."
On April 1, 2021, the buyer's financial advisor, Rusty Ray, emailed Michael Taglich, stating that the buyer wanted to consummate the transaction and was "willing to offer $55M" to do so. Taglich responded and represented that the seller would "close ASAP" for $70 million — now a $30 million premium over the original purchase price — and advised the buyer not to respond with an offer of "$69.9m and one thousand dollars in S&H Green Stamps."
On April 5 and April 14, 2021, the buyer sent the seller termination notices pursuant to the Purchase Agreement demanding return of its termination fee and pointing to its good faith efforts, as well as to the seller's uncooperative stalling tactics and failure to meet conditions to closing.
The buyer commenced this action asserting a cause of action for specific performance compelling the seller to consummate the purchase on the ground that it was "ready, willing and able to perform" and that the seller breached its duties and obligations under the Purchase Agreement. The buyer also asserted a cause of action for injunctive relief enjoining and restraining the seller from selling the company to a third party. In addition, the buyer asserted two alternative claims to the first and second causes of action: 1) a claim for breach of implied covenant of good faith and fair dealing relating to the seller's attempts to increase the purchase price in contravention of the terms of the Purchase Agreement, seeking specific performance based on that breach, and 2) a claim for a declaratory judgment seeking a declaration that the buyer is entitled to specific performance for the return of the termination fee.
Following completion of discovery, the seller moved to dismiss the complaint. As relevant to this appeal, the seller contended that the documentary evidence established that the buyer had repudiated the Purchase Agreement by refusing to close as scheduled and that the parties exercised their rights to terminate the Purchase Agreement, both of which barred the buyer from seeking specific performance.
The buyer opposed and moved for summary judgment on the first cause of action for specific performance of the Purchase Agreement, contending that no issues of fact existed as to the elements for specific performance under governing Delaware law. The buyer asserted that the Purchase Agreement was a valid contract that explicitly provided for the remedy given the seller's breach in failing to close. The buyer argued that the record established that it was ready, willing, and able to close under the Purchase Agreement, but that [*8]the seller improperly and in bad faith pulled out of the transaction.
Supreme Court granted the buyer's motion for summary judgment on the first cause of action for specific performance, and directed that the purchase price be held in escrow. The court determined that the record established several facts: the Purchase Agreement was a valid contract; the buyer was ready, willing, and able to perform under the agreement; the seller conceded that the buyer had sufficient funds to close; the seller prevented the timely closing in bad faith so that it could sell the company for more money; and the March 29 closing date was not "time is of the essence." It then found "the record unequivocally establishes that [Michael Taglich and the seller's principals], motivated by dissatisfaction with the business deal that the seller . . . cut and fueled by unabashed insidious antisemitism, actively prevented the buyer from closing and breached the Purchase Agreement." Supreme Court found that the seller "actively took glee in frustrating the buyer's ability to close and in being gratuitously abusive and disrespectful of the buyer's principals and their religious observance." According to Supreme Court, the breaches included: the seller's failure to deliver the IT server needed to operate the company prior to the closing date as required under the Purchase Agreement; its efforts to "shake down" the buyer for additional compensation not negotiated in the Purchase Agreement to be delivered before the required audit was completed; the seller's refusal to speak with the buyer about the demanded increased purchase price, which further established a breach of the covenant of good faith and fair dealing; and the seller's refusal to timely provide the necessary closing documents. Finding that the equities weighed in favor of the buyer, the court ordered the seller to immediately deliver the closing deliverables, including the IT server, and directed the buyer to deliver $32 million of the total estimated purchase price into escrow, pending the audit to determine post closing adjustments.
Supreme Court then denied the seller's motion to dismiss the complaint. The court rejected the seller's argument that the buyer repudiated the Purchase Agreement before the March 29 closing date, and found that the communications from the buyer seeking to move the closing date from the second day of Passover, March 29, to the following day, "merely represent exasperation at the [the seller's] flat refusal to permit a single day of adjournment . . . in respect of the Jewish holiday."
On appeal, the seller seeks only reversal of Supreme Court's grant of summary judgment to the buyer on its specific performance claim, and the denial of its motion to dismiss that claim. The seller argues that Supreme Court erred in three ways: first, the buyer was not ready, willing and able to close; second, the buyer repudiated the Purchase Agreement; and third, the Purchase Agreement was terminated.
Under [*9]Delaware law, which governs the Purchase Agreement, the principle is well-settled that a party seeking specific performance "must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance" (Estate of Osborn v Kemp, 991 A2d 1153, 1158 [Del 2010]).
Here, there is no dispute that the seller validly terminated the Purchase Agreement on March 22, and that, pursuant to the revised rescission notice, it agreed to rescind the termination provided that the buyer simply wire transfer the $49 million purchase price on or before March 29 at 5 p.m. — a condition requested by the buyer and agreed to by the seller. Thus, regardless of the fulfilment of other closing details, the buyer merely had to wire transfer the $49 million purchase price by this deadline to rescind the termination. The buyer had complete control over satisfying this condition to consummate the deal and avoid termination of the Purchase Agreement. There is also no dispute that the buyer had the funds under the Purchase Agreement to close, notwithstanding the parties' disagreement concerning the rebasing payment and their failure to execute the proposed fourth amendment. The buyer was ready, willing, and able to close, particularly given that Jeffrey Shemia represented to Michael Taglich that the "money is locked and loaded to go &commat; 49/50mm approx," requested that the server be delivered on March 30, and stated that the "re-basing check will come . . . when we get it after close." Further, nothing in the record demonstrates that the seller prevented the buyer from wiring the purchase price, especially where the seller had already provided the buyer with wire instructions and a closing statement on March 26, setting forth a calculation of the closing date cash payment (cf. Snow Phipps Group, LLC v KCAKE Acquisition, Inc., 2021 WL 1714202, *51-56, 2021 Del Ch LEXIS 84, *107-120 [Del Ch Apr. 30, 2021, C.A. No. 2020-0282-KSJM] [ordering specific performance of stock purchase agreement where defendants obstructed plaintiffs' ability to meet a closing financing condition and "ran out the clock" until automatic termination of the agreement occurred]). In fact, based on that weekend's text messages amongst themselves, the seller's principals clearly understood that the buyer meeting this wire transfer deadline would consummate the purchase of Extended Nursing.
A party seeking specific performance must have performed its own obligations within the time specified under the contract unless the obligation is waived (see Hastings Funeral Home, Inc. v Hastings, 2022 WL 16921785, *6, 2022 Del Ch LEXIS 327, *16-17 [Del Ch Nov. 14, 2022, C.A. No. 221-0373-PWG], citing Wells v Lee Builders, Inc., 34 Del Ch 107, 109 [1953]). Here, the seller did not waive the wire transfer deadline. The buyer should not have been granted summary judgment on its claim for specific performance because it failed [*10]to wire transfer the funds by the deadline. As a consequence, the condition for rescission of the seller's termination was not met, and the termination was revived, retroactive to March 22. The question that remains is whether Supreme Court should have granted seller's motion to dismiss the specific performance claim. For the reasons that follow, we find that Supreme Court correctly denied the motion.
The seller argues that time was of the essence concerning the closing for this transaction, and that Supreme Court erred in finding to the contrary. We agree that on this record Supreme Court should not have found that time was not of the essence, but disagree that the seller demonstrated that it was, in fact, of the essence.
The seller argues that although the Purchase Agreement did not expressly state "time is of the essence," the parties' agreement to the "outside date" in the Purchase Agreement is the equivalent of "time is of the essence" under Delaware law (see Dermatology Assoc. of San Antonio v Oliver St. Dermatology Mgt. LLC, 2020 WL 4581674, *22, 2020 Del Ch LEXIS, *41 [Del Ch Aug. 10, 2020, C.A. No. 2017-0665-KSJM]; Vintage Rodeo Parent, LLC v Rent-A-Center, Inc., 2019 WL 1223026, *13, 2019 Del Ch LEXIS 87, *37-38 [Del Ch Mar. 14, 2019, C.A. No. 2018-0927-SG]). The seller emphasizes that the parties designated March 25, 2021 as the outside date in the Purchase Agreement. The seller viewed that date as essential because it did not want to hold the deal open indefinitely at the negotiated purchase price, the value of the company could change over time, and a prolonged period of uncertainty would be harmful to the business. Were those the sole facts, the seller would prevail in its argument that under Delaware law, the buyer's specific performance claim would be dismissed for failing to close on March 25, a date that was time of the essence. But those are not the sole facts.
When a contract fails to contain a clear time of the essence clause, time will be of the essence only if the circumstances surrounding the contract or the parties' course of dealing clearly indicate that strict compliance with a specified timeframe was intended (see HIFN, Inc. v Intel Corp., 2007 WL 1309376, *9, 2007 Del Ch LEXIS, *29-30 [Del Ch May 2, 2007, No. Civ. A. 1835-VCS]). The seller's claim that the March 25 outside date was essential is belied by the fact that pursuant to the third amendment the seller agreed to adjourn the closing to four days after the "essential" outside date to March 29, a date the buyer chose. The record also raises factual issues concerning the merits of seller's time of the essence defense.
Here, almost immediately after the seller agreed to the buyer's March 29 date as the new closing date, the buyer requested a one-day religious accommodation to March 30 for the second day of Passover. Frustrated at what the seller believed was another delay tactic, it refused and informed the buyer that it was adhering to the March 29 closing date[*11]. Ostensibly, the seller's motivation for refusing the one-day accommodation was due to its frustration and concern with the buyer's desire to consummate the deal. Indeed, there is evidence to support the seller's reason for questioning the sincerity of the buyer's religious observance explanation — namely, the buyer's four failed closings prior to the outside date, two dates of which were chosen by the buyer; its difficulty in obtaining DOH approval and requisite financing, and the buyer's request for a one-day adjournment the same day that the seller agreed to the March 29 closing date. In fact, as the events unfolded over that weekend, the buyer changed its mind and wanted to close on March 29.
On the other hand, the record also demonstrates that the $9 million rebasing payment monies became a pointed issue with the seller taking the position that it was entitled to the payment and the buyer taking a contrary view. Further, the seller's principals engaged in text messages that appear to indicate that they were having seller's remorse, and that if they did not go through with the transaction, they would have the rebasing payment monies and would be able to "mov[e] on to build[] more value and new business lines." The record shows that the seller continually sought ways to leverage additional monies. Indeed, on April 1, a mere three days after the transaction failed to close, in response to the buyer's overtures to consummate the transaction for $55 million, the seller informed the buyer that it would close "ASAP" for $70 million, a $30 million premium over the original purchase price and advised the buyer not to respond with an offer of "$69.9m and one thousand dollars in S&H Green Stamps."
These factual issues inform whether the seller's motivation and reasons for not granting the one-day adjournment were legitimate or pretextual. If the former, then the 5 p.m. March 29 deadline could be deemed to be time of the essence and the seller's refusal to grant the one-day adjournment would be valid. In other words, the seller would have established that the Purchase Agreement's termination resulted solely from the buyer's failure to meet the deadline, and that the buyer's failure to wire the closing funds by that deadline bars its specific performance claim. However, if the latter, then the seller's failure to provide a one-day adjournment may be deemed to have been done in bad faith, the March 29 closing may not have been time of the essence, and the buyer may be entitled to specific performance. Under the circumstances, these unresolved issues preclude a finding that time was of the essence for the March 29 closing date.
Regardless of how this issue is resolved, the Seller argues that this claim should be dismissed because the buyer repudiated the Purchase Agreement. Under Delaware law, a repudiation of a contract is an outright refusal by a party to perform a contract or its conditions (see HIFN, 2007 WL 1309376 at *14, 2007 Del Ch LEXIS at *47[*12]-49). Further, a statement of intent not to perform unless terms different from the original contract are met is a repudiation (id., 2007 WL 1309376 at *14, 2007 Del Ch LEXIS at *47). A party may repudiate an obligation through statements when such language, reasonably interpreted, indicates that the party will not perform (see West Willow-Bay Court, LLC v Robino-Bay Court Plaza, LLC, 2009 WL 458779, *5, 2009 Del Ch LEXIS 23, *15 [Del Ch Feb. 23, 2009, C.A. No. 2742-VCN]). Repudiation must be "positive and unconditional" (id.). The mere entry into negotiations to change the terms of a contract is not sufficient to establish a repudiation (see HIFN, 2007 WL 1309376 at *14, 2007 Del Ch LEXIS at *47). To constitute a repudiation, a request for modification of contract terms must be accompanied by an absolute refusal to perform unless the request is granted (id.). The Chancery Court in West Willow-Bay provides a cogent analysis of how to deal with a repudiation and retraction under Delaware law:
"A party confronted with repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation. Although perhaps counterintuitive, whether repudiation amounts to a present breach is predicated on the promisee's response. Unless the non-repudiating party relies upon the repudiation or notifies the promisor that it considers the repudiation final, the promisor may retract his repudiation, thereby returning the parties to the status quo ante. Once the promisee relies on the repudiation — e.g., by filing suit for damages or by engaging in a substitute transaction — or notifies the promisor it regards the repudiation as final, effective retraction is no longer possible. A promisee may treat the contract as terminated in several different ways. For example, in something of a defensive posture, it may suspend its own performance when faced with repudiation, in which case, no 'acceptance' of repudiation is necessary. If instead the promisee seeks to treat repudiation as a breach presently remediable by damages, it must manifest its decision to treat the contract as terminated. One way this may be accomplished is by filing suit for money damages. Alternatively, the non-repudiating party may lobby for performance. The promisee may urge performance extrajudicially, and if the promisor fails to retract its repudiation, the promisee may consider the contract terminated as though it never sought retraction. A party may urge performance of the contract judicially by suing for specific performance:
'A suit seeking specific performance is, however, in effect, an assertion not that the promisee elects to finalize the breach claimed and calculate his damages now, but rather that the promisee treats the mutual obligations as being still in force. Where the promisee does so, there is no purpose to be served by treating the filing of suit as cutting off the promisor's power to [*13]retract. . . .'
"Finally, the non-repudiating party may ignore the repudiation. This response hazards retraction at any point up until the time for performance has passed."
(2009 WL 458779 at *5, 2009 Del Ch LEXIS at *15-20 [citations omitted]).
All the events transpiring March 25 through March 29 form the factual basis for this defense. There can be no dispute that after the seller rejected the buyer's request for a one-day adjournment to March 30 to accommodate its principals' religious observances, the buyer's principal, Agnes Shemia, informed the seller's principal, Vincent Achilarre, that the buyer would not close, upon which Achilarre sought confirmation. The buyer then confirmed same when Jeffrey Shemia texted Michael Taglich, "Keep your company[,] I'm not going to close then." Shortly after receiving this confirmation, the seller, among other things, cancelled the transfer of the IT server, a purported key closing requirement. Up until this point, the seller appeared to deem the buyer's representations to be a repudiation of the Purchase Agreement. Under Delaware law, these facts, standing alone, would establish the buyer's repudiation. However, that is not the end of the inquiry.
What occurred over the weekend was, at a minimum, unbecoming behavior for parties participating in a multimillion-dollar commercial transaction (see Macy's, Inc. v J.C. Penney Corp., Inc., 45 Misc 3d 274 [Sup Ct, NY County 2014], affd as modified 127 AD3d 48 [1st Dept 2015]). Suffice to say, what unfolded could be viewed as a repudiation by the buyer, a retraction by the buyer of its repudiation, a rejection by the seller of the retraction, followed by the seller's attempt to revive the deal at a premium purchase price, which the buyer rejected. Regardless, the seller's repudiation defense is unavailing.
While the seller's cancellation of the transfer of the IT server may be indicative of its position to deem the buyer as repudiating the Purchase Agreement, the seller overlooks two critical facts fatal to its repudiation argument. First, the revised rescission notice unequivocally conditioned closing on the buyer's wire transfer of the purchase price on March 29 by 5 p.m., regardless of whether the parties satisfied the closing requirements, which included the transfer of the IT server. Indeed, over the tumultuous weekend, the buyer indicated that the IT server could be delivered post closing. Thus, the seller's reliance on its cancellation of the transfer of the IT server to prove that it deemed the buyer in repudiation is misplaced. The buyer was willing to accept delivery of the IT server post closing. Second, and more importantly, the seller's principals, themselves, unambiguously took the position that the buyer had until March 29, 5 p.m. to close:
Vincent Achilarre, 5:21 p.m.: "No wires received . . . [w]e are done — [Purchase Agreement] has expired . . . Moving on to building more value and new business lines."
Under these circumstances, even if the [*14]buyer were to have repudiated the Purchase Agreement, the seller clearly and unequivocally ignored the repudiation, and, as a consequence, is left to deal with the issue of whether time was of the essence (see West Willow-Bay, 2009 WL 458779 at *5, 2009 Del Ch LEXIS 23 at *15).
The seller's last defense to the buyer's specific performance claim is based on buyer's April 5 and 14 termination notices. The seller argues that the buyer's demand for return of the termination fee in both notices reflects an unequivocal and final election not to proceed with the transaction, which bars specific performance of the Purchase Agreement. Simply stated, the seller's argument is that the buyer "could not both get that money back and buy the Company," the proverbial having your cake and eating it too. That is not the case here. While facially both remedies appear to be inconsistent, a further review of the record establishes that the buyer's claim to the termination fee is an alternative to its main claim for specific performance of the Purchase Agreement in the event it does not prevail against the seller on that claim. Nonetheless, the seller asserts that the buyer is barred from pursuing specific performance because the Purchase Agreement was terminated. This argument is unavailing.
Section 12.2(c) of the Purchase Agreement provides:
"Except as specifically set forth in this Article XII, in the event of termination of this Agreement pursuant to Section 12.1, all obligations under this Agreement shall terminate and shall be of no further force or effect and there shall be no liability on the part of the Buyer, the Company or any of the Sellers to one another; except as set forth in Section 12.2(a) [that Seller does not have specific performance remedy] and Section 12.2(b) [Buyer recovers termination fee and other expenses] and except that, the rights and obligations of the Parties set forth in this Section 12.2 ["Effect of Termination"], Article XIII ["DEFINITIONS"] and Article XIV ["MISCELLANEOUS"], inclusive, shall survive such termination.
(italics added).
Article XIV, § 14.17 of the Purchase Agreement provides:
"Specific Performance. The rights and remedies of the parties to this Agreement shall be cumulative. The Parties agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms of this Agreement and that money damages would not be a sufficient remedy for any breach of this Agreement; accordingly, subject to the limitations set forth in Section 12.2(a) [which precludes seller's entitlement of specific performance in the event of Buyer's breach or failure to close], the Parties shall be entitled to specific performance of this Agreement and an injunction restraining any such Party from such breach or threatened breach. Each of the Parties hereto hereby waives (i) any defense that a remedy at law would be adequate in any action for specific performance and (ii) any requirement [*15]under any Law to post a bond or other security as a prerequisite to obtaining equitable relief."
(italics added).
These two provisions are clear and unambiguous — the buyer's remedy of specific performance survives termination of the Purchase Agreement. Contrary to the seller's reading, specific performance is applicable to "this Agreement" and is subject only to the limitations set forth in section 12.2(a), which precludes the seller's entitlement to specific performance in the event of the buyer's breach or failure to close (see Osborn, 991 A2d at 1159-1160 ["[w]hen the contract is clear and unambiguous, we will give effect to the plain meaning of the contract's terms and provisions."]).
Accordingly, the order of the Supreme Court, New York County (Andrew Borrok, J.), entered December 3, 2021, which, insofar as appealed from as limited by the briefs, granted plaintiff's motion for summary judgment on the first cause of action for specific performance, and directed defendants to immediately deliver the closing deliverables, including the IT server, and to deposit certain amounts of the purchase price into escrow, and denied defendants' motion to dismiss the specific performance claim, should be modified, on the law, to deny plaintiff's motion, and otherwise affirmed, without costs.
Order, Supreme Court, New York County (Andrew Borrok, J.), entered December 3, 2021, modified, on the law, to deny plaintiff's motion, and otherwise affirmed, without costs.
Opinion by Oing, J. All concur.
Kern, J.P., Oing, Scarpulla, Pitt-Burke, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: April 4, 2023